The STATE of Ohio, Appellee,

v.

PETERSON, Appellant.

[Cite as *State v. Peterson*, 173 Ohio App.3d 575, 2007-Ohio-5667.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 22008.

Decided Oct. 19, 2007.

</div>

Mathia H. Heck Jr., Montgomery County Prosecuting Attorney, and Mark J. Keller, Assistant Prosecuting Attorney, for appellee.

Daniel J. O'Brien, for appellant.

BROGAN, Judge.

{¶ 1} Appellant, Kevin Peterson, appeals from his conviction of two counts of possession of cocaine in the Montgomery Court of Common Pleas pursuant to his no-contest plea after Peterson's suppression motion was overruled by the trial court.

{¶ 2} On October 18, 2004, Detective Douglas Hall of the Dayton Police Department was made aware of two complaints received on the drug hotline concerning drug activity at 1609 Westona Drive in Dayton, Ohio. The following day, Detective Hall received a handwritten note also complaining of drug activity at 1609 Westona Drive. The note described the activity as heaviest after 9:00 p.m. and indicated that the residence had a surveillance camera on the front door. On October 20, 2004, based upon the complaints, Detective Hall set up surveillance just across the intersection of Westona and Marimont sometime between 9:00 and 9:30 that night. During this surveillance, Hall watched as a minivan pulled up in front of 1609 Westona and the front passenger got out of the van and

entered the residence. Meanwhile, another passenger got out of the rear of the minivan and walked up the street to the corner of Westona and Marimont while talking on a cell phone and looking up and down both streets. The front passenger remained in the residence for approximately three minutes and then returned to the minivan. The rear passenger also returned to the minivan, and the van drove away. Hall then contacted members of the narcotics unit and uniformed officers from the second police district to assist him in conducting a knock-and-advise.[1] The additional officers were briefed on the information known by Hall. The team then went back to 1609 Westona to conduct the knock-and-advise. One of the two uniformed officers and Sergeant Mark Spears accompanied Hall onto the front porch. The remaining officers took up positions around the sides of the house, as is standard practice to ensure that no one runs out the back or throws anything out a window. Detective Darrel House and Detective Shawn Emerson walked across the lawn to the rear of the north side of the residence. After being informed over the police radio that the officers on the front porch were about to make contact, House proceeded to walk back toward the front of the residence. Hall then knocked on the front door, and when Kevin Peterson answered the door, Hall told him about the complaints of drug activity. Peterson responded that he had lived at the address only about a month and a half.

{¶ 3} While moving toward the front of the residence, House testified at the hearing, he heard the heavy footsteps of someone running down stairs. At that point, he looked down into a basement window from a standing position on the north side of the house and saw a person running down the stairs holding a glass jar cupped in both hands as if the jar was hot. House testified that he immediately ran around to the front of the house because he believed the person was trying to destroy crack cocaine that had just been cooked. House then ran onto the porch and yelled that he was going into the basement. Hall followed House through the residence and into the basement, where the two found a man, later identified as Darrel Loranzan, with his hand in a duffle bag that had a piece of crack cocaine and a spoon lying on top of it. The officers also observed a part of a gun inside the duffle bag. After leaving the basement, Hall observed a police scanner on top of a kitchen counter as well as a plate with what appeared to be crack cocaine residue on top of the refrigerator. The plate and the piece of crack cocaine from the duffle bag tested positive. Hall then left the residence to obtain a search warrant. After getting the search warrant, the police recovered cocaine

---

1. Detective Hall testified at the suppression hearing that a knock-and-advise is a procedure used by the police department to investigate drug complaints. This type of investigation is done by knocking on the door and advising the occupants that there have been complaints of drug activity and then seeking consent to search.

and handguns and other items linking Peterson to the bedroom searched and residence. He was then arrested.

{¶ 4} On December 13, 2004, Peterson moved to have the evidence from the search suppressed. Kristen Brandenburg testified at the suppression hearing for the defendant that she babysat for the defendant's sons and was present in the home at the time of the search. She testified that she had just finished a load of laundry in the basement when the police arrived. She said that the basement windows on the north side of the house were covered with foil from the inside so no one could see into the basement from the outside. She also testified that there was a plastic cover over the basement window closest to the front of the house. She testified that she felt secure in the basement because the windows were covered with foil.

{¶ 5} Alicia Erwin, the defendant's girlfriend, who occasionally lived at the residence with the defendant and his small child, also testified at the hearing. Erwin testified that she was upstairs watching television when she looked outside and saw five men around the side of the house and two of them crouched down looking in the basement windows. Erwin testified that she started to go downstairs when the police entered the house through the front door, and she and the defendant were handcuffed. She testified that one of the basement windows had a plastic cover over it, and every window had aluminum foil covering it so no one could see into the basement.

{¶ 6} Peterson testified at the hearing that the front basement window that Officer House said he looked through was covered by a plastic covering on the outside and aluminum foil on the inside. The defendant testified that the foil was placed on the windows because the women in the house didn't want people looking in on them when they were downstairs doing laundry.

{¶ 7} In rebuttal, the state produced the testimony of Detective Emerson, who testified that he was present when the officers entered the defendant's home and that the basement windows were not covered when the officers looked into the basement.

{¶ 8} On August 7, 2006, the trial court overruled Peterson's suppression motion. The judge stated that he did not find the defense witnesses credible. The judge also stated that the defendant had failed to meet his burden of proof upon his motion. The court did not address the question whether Detective House had a right to be where he was when he observed the activity in the basement that prompted the police officers to enter Peterson's residence without a search warrant.

{¶ 9} On appeal, Peterson raises the following assignment of error:

{¶ 10} "The trial court in denying [sic] defendant-appellant his constitutional rights under the Fourth Amendment to the United States Constitution and Article 1, Section 14, of the Ohio Constitution, by overruling his motion to suppress the evidence obtained by the police after entering the premises at 1609 Westona Drive, Dayton, Ohio without any warrant of any kind." Specifically, Peterson argues that Detective House's observations that gave rise to the initial warrantless search were made while he was trespassing upon the curtilage of Peterson's property. He therefore argues that the evidence recovered from the search of his home should have been suppressed by the trial court.

{¶ 11} It is fundamental that searches conducted outside the judicial process, without a warrant, are per se unreasonable, subject to a few specifically established and well-delineated exceptions. *Katz v. United States*, (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576. The burden is on those seeking an exemption from the constitutional process to show the need for it. It is undisputed that the police entered Peterson's residence without a search warrant and therefore that the state bore the burden of establishing that the warrantless search fell within an exception to the Fourth Amendment warrant requirement. *Athens v. Wolf* (1974), 38 Ohio St.2d 237, 67 O.O.2d 317, 313 N.E.2d 405. The state, for its part, argues that Detective House had a right to be on Peterson's property to execute the knock-and-advise and therefore that his observations were made in plain view and gave him grounds to conduct an immediate search of Peterson's home to apprehend the person he saw in the basement carrying suspected drugs under the exigent-circumstances exception.

{¶ 12} Analysis of Fourth Amendment law is primarily focused on whether a person has a "constitutionally protected reasonable expectation of privacy." *Katz*, 389 U.S. at 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (Harlan, J., concurring). "[T]here is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" Id. at 361, 88 S.Ct. 507, 19 L.Ed.2d 576.

{¶ 13} "[O]bservations of things in plain sight made from a place where a police officer has a right to be do not amount to a search in the constitutional sense. On the other hand, when observations are made from a position to which the officer has not been expressly or implicitly invited, the intrusion is unlawful * * *." *Lorenzana v. Superior Court* (1973), 9 Cal.3d 626, 634, 108 Cal.Rptr. 585, 511 P.2d 33.

{¶ 14} In *Oliver v. United States* (1984), 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214, the United States Supreme Court held that police did not violate the defendant's Fourth Amendment rights when they trespassed onto the defendant's

farm field several hundred feet from the defendant's farmhouse. Justice White noted that a person may not legitimately demand privacy for activities conducted out of doors, except in the area immediately surrounding the home. Id. at 178, 104 S.Ct. 1735, 80 L.Ed.2d 214. He noted that open fields do not provide the setting for those intimate activities that the amendment is intended to shelter from government interference or surveillance. Id. at 179, 104 S.Ct. 1735, 80 L.Ed.2d 214. The court noted that only the curtilage warrants the Fourth Amendment protections that attach to the home. Id. at 180, 104 S.Ct. 1735, 80 L.Ed.2d 214.

{¶ 15} Even if property is within the curtilage, a visual inspection of that property from outside the curtilage does not constitute a search. *United States v. Hatfield* (C.A.10, 2003), 333 F.3d 1189. In *Hatfield*, police officers' observations of a back yard while standing on a paved parking pad next to a house, during which an officer formed an opinion that marijuana plants might be growing in yard, did not constitute a search under the Fourth Amendment because the driveway was open to the public. Circuit Judge Ebel noted in the opinion: "Furthermore, the Court said that, 'the fact that the objects observed by the officers lay within an area that we have assumed * * * was protected by the Fourth Amendment does not affect our conclusion.' The court emphasized that 'the officers never entered the barn, nor did they enter any other structure on respondent's premises.' Instead, '[o]nce at their vantage point, they merely stood, outside the curtilage of the house and in the open fields upon which the barn was constructed, and peered into the barn's open front.' Thus, 'standing as they were in the open fields, the Constitution did not forbid them to observe the [drug] laboratory located in respondent's barn.'" (Citations omitted.) Id. at 1197, quoting *United States v. Dunn* (1987), 480 U.S. 294, 304, 107 S.Ct. 1134, 94 L.Ed.2d 326. The court further observed at pages 1197 and 1198 of the opinion:

{¶ 16} "Similarly, *Fullbright* [v. *United States* (C.A.10, 1968), 392 F.2d 432] involved law enforcement officers who, while trespassing on the defendant's open fields, observed from a distance the interior of an open shed located in the property's curtilage. 392 F.2d at 433–34. We held the officers' observation of an illegal distilling operation in the shed was not a search prohibited by the Fourth Amendment. Id. at 434. We explained, however, that '[i]f the investigators had physically breached the curtilage there would be little doubt that any observations made therein would have been proscribed. But observations from outside the curtilage of activities within are not generally interdicted by the Constitution.' Id.; see also 1 LaFave, [Search and Seizure (1996) 515, Section 2.3(g) ] supra, § 2.3(g), at 515 (reasoning that police observation of incriminating objects or activity 'is unobjectionable—even if what is seen is itself within the protected area

called the "curtilage"—if the police vantage point was itself in the "open fields" ')."

{¶ 17} The curtilage is an area around a person's home upon which he or she may reasonably expect the sanctity and privacy of the home. *Oliver*, 466 U.S. at 180, 104 S.Ct. 1735, 80 L.Ed.2d 214. Because the curtilage of a property is considered to be part of a person's home, the right of the police to come into the curtilage is highly circumscribed. *State v. Woljevach*, 160 Ohio App.3d 757, 2005-Ohio-2085, 828 N.E.2d 1015, at ¶ 29. Absent a warrant, police have no greater rights on another's property than any other visitor has. Id. The only areas of the curtilage where the officers may go are those impliedly open to the public. Id.

{¶ 18} In *Lorenzana*, observations were made by an officer after he had gone to the back of an apartment by traveling down the adjacent driveway. Id. at 630, 108 Cal.Rptr. 585, 511 P.2d 33. When he could not get a clear view from his position on the adjacent driveway, he crossed the lawn of the apartment and stood beneath a window on the east side of the apartment. The window shade was pulled all but two inches from the bottom of the window sill. From this position, the officer put his face within one inch of the window and was able to overhear a phone conversation discussing the acquisition of narcotics. The court held that the observations made by the officer and conversations heard by him violated the defendant's right to privacy. Id. at 641, 108 Cal.Rptr. 585, 511 P.2d 33. Justice Tobriner wrote the following on behalf of the California Supreme Court:

{¶ 19} "The crucial question we face here is whether a citizen may properly be subjected to the peering of the policeman who, without a search warrant, walks over ground to which the public has not been invited but which has been reserved for private enjoyment, stands by a window on the side of a house and peeks through a two-inch gap between the drawn window shade and the sill, and thus manages to observe the conduct of those within the residence. We conclude that the questioned police procedure too closely resembles the process of the police state, too dangerously intrudes upon the individual's reasonable expectancy of privacy, and thus too clearly transgresses constitutional principle; the prosecution cannot introduce into evidence, and the courts cannot be tainted with, that which the intrusion yields." Id. at 629, 108 Cal.Rptr. 585, 511 P.2d 33.

{¶ 20} As for the contention that the defendant had no justified expectation of privacy because he had not succeeded in totally concealing his criminal activity from such surveillance by the natural senses, the *Lorenzana* court responded:

{¶ 21} "The fact that apertures existed in the window, so that an unlawfully intruding individual so motivated could spy into the residence, does not dispel the

reasonableness of the occupants' expectation of privacy. * * * To the contrary, the facts of this case demonstrate that by drawing the window shade petitioner Lorenzana exhibited a reasonable expectation to be free from surveillance conducted from a vantage point in the surrounding property not open to public or common use. Surely our state and federal Constitutions and the cases interpreting them foreclose a regression into an Orwellian society in which a citizen, in order to preserve a modicum of privacy, would be compelled to encase himself in a light-tight, air-proof box." Id. at 636–637, 108 Cal.Rptr. 585, 511 P.2d 33.

{¶ 22} In *People v. Camacho* (2000), 23 Cal.4th 824, 98 Cal.Rptr.2d 232, 3 P.3d 878, the California Supreme Court held that the defendant had a reasonable expectation of privacy as to police officers' warrantless search by looking into side windows of defendant's home. Id. at 837, 98 Cal.Rptr.2d 232, 3 P.3d 878. In *Camacho,* police responded to Camacho's home on the report of a loud party. Id. at 828, 98 Cal.Rptr.2d 232, 3 P.3d 878. Officers Wood and Mora arrived at the home at 11:00 p.m. and heard no loud noise. The officers did not knock on the front door, but Mora walked onto the side yard of the single-story house. There was no entrance accessible to the house from the side yard. Officer Moore came upon a large side window that was visible from the public street or sidewalk, but the inside of the room was not. Id. The neighbors on the side of the house would have difficulty seeing into the window, and the yard had no exterior lighting. Officer Wood looked through the window and saw the defendant manipulating some clear plastic bags. Id. at 829, 98 Cal.Rptr.2d 232, 3 P.3d 878. Wood saw several plastic bags with a white powdery substance on the bed and dresser in the room, as well as a cellular phone and pager. The police then entered the home through the window and arrested the defendant.

{¶ 23} In affirming the court of appeals' reversal of the trial court's denial of the defendant's suppression motion, Justice Werdegar of the California Supreme Court wrote:

{¶ 24} "Respondent contends that Officers Wood and Mora's observations were constitutionally permissible because 'nothing prohibited access to and from [the] side yard from the street along the side of the house.' We might add that, from the photographs of the scene included in the record, one might expect that at some point, a neighbor's child, should the need arise, might retrieve an errant ball or loose pet from the side yard of defendant's home. Similarly, an employee of the local utility company might at some point enter the yard to read the meter, were one located there. Admittedly there was no fence, no sign proclaiming 'No trespassing,' no impediment to entry.

{¶ 25} "Nevertheless, we cannot accept the proposition that defendant forfeited the expectation his property would remain private simply because he did not erect an impregnable barrier to access. Recalling that the lodestar of our inquiry

is the reasonableness of defendant's expectation of privacy, we assume for the sake of argument the meter reader or the child chasing a ball or pet may have implied consent to enter the yard for that narrow reason, for a limited time, and during a reasonable hour. Certainly the same cannot be said for the unconsented-to intrusion by police at 11 o'clock at night. (See Pen.Code, § 647, subd. (i) [a person commits misdemeanor of disorderly conduct '[w]ho, while loitering, prowling, or wandering upon the private property of another, at any time, peeks in the door or window of any inhabited building or structure, without visible or lawful business with the owner or occupant']; see also *Bond* [*v. United States*], *supra*, 529 U.S. [334] at pp. 337–338, 120 S.Ct. [1462] at p. 1465, 146 L.Ed.2d [365] at p. 370 [placing one's baggage in the overhead compartment in a bus, where other passengers may touch and move it, does not relinquish the expectation of privacy in the bag's contents, such that police may feel the bag in an exploratory manner to try and determine its contents].)" Id. at 836, 98 Cal.Rptr.2d 232, 3 P.3d 878.

{¶ 26} It is important that the police were at Peterson's residence initially to execute a knock-and-advise and not to execute a search warrant. The purpose of the knock-and-advise program, as stated in a general order of the Dayton Police Department, is to notify residents that a complaint has been received alleging drug activity at the premises. This, of course, can be accomplished by going to the front door of the residence and knocking and advising the resident of the purpose of the visit. In executing a search warrant, the warrant normally authorizes officers to enter the residence, the surrounding curtilage, and any detached garage or outbuildings listed in the warrant.

{¶ 27} The state argues that we have held that police officers are privileged to be on private property while in the performance of their official duties, citing *State v. McClain* (2003), Montgomery App. 19710, 2003-Ohio-5329, 2003 WL 22287581. In that case, however, the observations of the police officer were made through the passenger window of a car parked in a front driveway accessible to the public.

{¶ 28} In this matter, Detective House testified at the suppression hearing that the window he looked through was on the side of the appellant's residence, which he accessed by walking on the lawn. Further, House testified that there was no driveway or sidewalk by the window and that he was standing a few feet from the side of the house. Similar to the officer in *Lorenzana*, House made his observations while standing on land not expressly open to the public.

{¶ 29} Citizens have an objectively reasonable expectation that police will not enter onto the side yards of their homes in the nighttime and peer into their basement windows. We agree with the appellant that Detective House's observations were made while he was trespassing on the curtilage of Peterson's property. Therefore, the evidence recovered by the police during the warrantless and

warrant searches was the product of the initial unlawful police conduct. The evidence was the fruit of the poisonous tree and must be suppressed. *Wong Sun v. United States* (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441.

{¶ 30} In suppressing drug evidence in *Camacho,* Judge Werdegar noted that the line the court drew lets an unquestionably guilty man go free, but he observed that "constitutional lines have to be drawn, and on one side of every one of them is an otherwise sympathetic case that provokes impatience with the Constitution and with the line. But constitutional lines are the price of constitutional government.' (*Agostini v. Felton* (1997), 521 U.S. 203, 254 [117 S.Ct. 1997, 2026, 138 L.Ed.2d 391] (dis. opn. of Souter, J.).)" 23 Cal.4th at 838, 98 Cal.Rptr.2d 232, 3 P.3d 878.

{¶ 31} The appellant's assignment of error is sustained. The judgment of the trial court is reversed, and the cause is remanded for further proceedings.

Judgment reversed
and cause remanded.

WOLFF, P.J., and FAIN, J., concur.