[Cite as *State v. Miller*, 2012-Ohio-5206.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                          :

    Plaintiff-Appellee                 :            C.A. CASE NO.    24609

v.                                     :            T.C. NO.    08CR1122

ANTONIO D. MILLER                      :            (Criminal appeal from
                                           Common Pleas Court)

    Defendant-Appellant                :

                                       :

· · · · · · · · · ·

**O P I N I O N**

Rendered on the ___9th___ day of ___November___, 2012.

· · · · · · · · · ·

KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

JAMES S. ARMSTRONG, Atty. Reg. No. 0020638, 131 North Ludlow Street, Suite 386 Talbott Tower, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

· · · · · · · · · ·

DONOVAN, J.

    **{¶ 1}**   Defendant-appellant Antonio D. Miller appeals the trial court's decision

denying his motion to suppress filed on April 29, 2008. A hearing was held before the trial court on said motion on December 2, 2008. The trial court issued its decision overruling Miller's motion to suppress on January 30, 2009. Miller filed a timely notice of appeal with this Court on April 26, 2011.

**{¶ 2}** The incident which forms the basis for the instant appeal occurred on the afternoon of March 17, 2008, after the Dayton Police Department's Special Investigations Division received numerous complaints from area residents regarding illegal drug activity occurring at a house located at 834 Rosedale Dr. in Dayton, Ohio. The residents alleged that numerous cars had been seen pulling up to the house, stopping for a short period of time, and then pulling away. Residents also observed an individual who would frequently leave the house on a bicycle, only to return a short time later. Dayton Police Sergeant Mark A. Spiers testified that this type of conduct was consistent with what the police described as an "active drug house." Based on this information, Sgt. Spiers decided to conduct a "knock and advise" at the house.[1]

**{¶ 3}** Accompanied by four or five Dayton Police detectives, Sgt. Spiers traveled to the house and knocked on the door. A male individual, later identified as Eric Walton, opened the door, and Sgt. Spiers identified himself as a Dayton Police Officer. Walton promptly closed the front door and locked it. Sgt. Spiers testified that he continued knocking on the door and announcing his presence until approximately thirty to forty-five

---

[1] A knock and advise is a procedure used by the police department to investigate drug complaints. *State v. Peterson*, 173 Ohio App.3d 575, 2007-Ohio-5667, 879 N.E.2d 806 (2d Dist.). This type of investigation is done by knocking on the door and advising the occupants that there have been complaints of drug activity and then seeking consent to search. Id.

seconds later when another male individual, later identified as the defendant, Miller, partially opened the door.

{¶ 4} While he was explaining the reason behind the knock and advise to Miller, Sgt. Spiers testified that he could smell the odor of raw marijuana coming from inside the house. Sgt. Spiers also testified that he could hear someone else standing behind the partially open front door. At that point, Sgt. Spiers asked Miller who was standing behind the door. Miller opened it further, and Walton stepped into view. After Miller opened the door, Sgt Spiers testified that he observed a coffee table behind the two men, approximately six feet from the door. Sgt. Spiers testified that he observed a digital scale and two plastic sandwich bags containing what appeared to be marijuana on the table.

{¶ 5} Sgt. Spiers testified that he immediately walked into the house and seized the marijuana and digital scale in order to preserve the items as evidence. After entering the house, Sgt. Spiers discovered a gallon sized plastic bag containing marijuana on top of a shoe box next to the sofa in the front room, and he seized it as well. At that point, Sgt. Spiers decided to obtain a search warrant to search the remainder of the house. Before doing so, however, Sgt. Spiers conducted a protective sweep of the house in order to confirm that no one else was present. Sgt. Spiers did not discover anyone else in the house during the subsequent sweep, but he did find an empty plastic baggie with cocaine residue lying in plain view on a chest in one of the bedrooms. During the sweep, the detectives also found two plastic bags containing a white powder in plain view in the dining room area. The white substance was field tested and determined to be cocaine. Sgt. Spiers arrested Miller and took him into custody. After the protective sweep was concluded, the detectives

obtained a search warrant for the house.

{¶ 6}  On March 25, 2008, Miller was indicted for one count of possession of heroin (more than 50 grams but less than 250 grams), in violation of R.C. 2925.11(A), a felony of the first degree; one count of possession of cocaine (more than five grams but less than twenty-five grams), in violation of R.C. 2925.11(A), a felony of the fourth degree; and one count of possession of marijuana (more than 200 grams but less than 1000 grams), in violation of R.C. 2925.11(A), a felony of the fifth degree.  Miller was later re-indicted for an additional count of having a weapon while under disability, in violation of R.C. 2923.13(A)(2), a felony of the third degree.

{¶ 7}  As previously stated, Miller filed a motion to suppress on April 29, 2008, which the trial court subsequently overruled.  On April 22, 2009, Miller pled no contest to possession of marijuana and possession of heroin.  The trial court sentenced Miller to a mandatory term of six years for possession of heroin and one year for possession of marijuana on April 15, 2011.  The trial court ordered the sentences to be served concurrently for an aggregate term of six years in prison.

{¶ 8}  Miller filed a timely notice of appeal with this Court on April 26, 2011.

{¶ 9}  Miller's first assignment of error is as follows:

{¶ 10}  "THE TRIAL COURT ERRED IN OVERRULING THE MOTION TO SUPPRESS."

{¶ 11}  In his first assignment, Miller contends that the trial court erred when it overruled his motion to suppress.  Specifically, Miller argues that the Dayton Police violated his Fourth Amendment rights when they improperly executed their "knock and

advise" policy in order to gain entrance to his house. For the following reasons, we agree with Miller.

**{¶ 12}** In regards to a motion to suppress, "the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *State v. Hopfer*, 112 Ohio App.3d 521, 548, 679 N.E.2d 321 (2d Dist. 1996), quoting *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (4th Dist.1994). The court of appeals must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. *State v. Isaac,* 2d Dist. Montgomery No. 20662, 2005-Ohio-3733, citing *State v. Retherford*, 93 Ohio App.3d 586, 639 N.E.2d 498 (2d Dist. 1994). Accepting those facts as true, the appellate court must then determine, as a matter of law and without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied. *Id*.

**{¶ 13}** Initially, we note that in other appellate districts in Ohio, as well as in other parts of the United States, the procedure at issue in this case is known as the "knock and talk" policy, while the policy is labeled as 'knock and advise" by the Dayton Police Department. Accordingly, for the purposes of this opinion, we will refer to this police practice as "knock and advise."

**{¶ 14}** The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution secure an individual's right to be free from unreasonable searches and seizures. *State v. Moore*, 2d Dist. Montgomery No. 20198, 2004-Ohio-3783. Police-citizen contact usually falls into one of three categories; to wit: 1) consensual encounters; 2) investigatory detentions or *Terry* stops; and 3) and seizures which are the

equivalent of arrests. *State v. Taylor*, 106 Ohio App.3d 741, 667 N.E.2d 60 (2d. Dist.1995). However, the only category relevant to this assignment of error is a consensual encounter.

{¶ 15} Consensual encounters occur when the police merely approach a person in a public place and engage the person in conversation, and the person remains free not to answer and to walk away. The encounter remains consensual even if the officer asks questions, requests to examine an individual's identification, and asks to search the person's belongings, provided that the officer does not convey that compliance is required. The Fourth Amendment guarantees are not implicated in such an encounter unless the police officer has by either physical force or show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter.

{¶ 16} Thus, the law permits police officers to engage in consensual encounters with suspects without violating the Fourth Amendment. *U.S. v. Thomas*, 430 F.3d 274, 277 (6th Cir.2005). Moreover, consensual encounters do not lose their propriety simply because they take place at the entrance of citizen's home. *Id.* A great number of courts, including the Second District Court of Appeals, have recognized "knock and advise" consensual encounters as a legitimate investigative technique at the home of a suspect or an individual with information about an investigation. *State v. Barber*, 2d Dist. Montgomery No. 19017, 2002-Ohio-3278. No reasonable suspicion on the part of the officers needs to be shown in order to justify a "knock and advise." *United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir.2000). A police officer's attempt to "knock and advise," however, can become coercive if the officer asserts his authority, refuses to leave, or otherwise makes the people inside feel

they cannot refuse to open the door. *United States v. Poe*, 462 F.3d 997, 1000 (8th Cir.2006).

{¶ 17}  In the instant case, Sgt. Spiers testified on direct as follows regarding the procedure followed during a "knock and advise:"

Q: And a knock and advise in layman's terms is what exactly?

A: Basically, we go out there, we contact the tenants there, we advise them of the complaints that we've been receiving, we let them know that if there is criminal activity occurring that they can bear responsibility for that.   So, we try to clear up some complaints, hopefully get some compliance, if there is drug activity there.

Q: And did you go to this address on Rosedale by yourself or did you have other officers with you?

A: No.   Normally when we do a knock and advise, we'll do it with several other detectives because these are drug houses, people are often armed.   We never know how many people are going to be inside or what we may encounter, so we normally do it as a group of detectives.   And I think on this particular night there might have been five or six of us out there.

Q: And did you, in fact, knock on the door?

A: Yes, we did.

Q: And when you knocked on the door, how were you dressed?

A: We were dressed in plain clothes, since we are detectives, but we were wearing – I wear what I call a hidden agenda jacket, which is a jacket that has a flip-down badge --

***

and a police logo and also a police logo on the back.   The other detectives were wearing what they call a tactical vest.   It's a vest that has "police" across the front, a badge on their left chest and then "police" across the back.   This is to identify ourselves as Dayton Police Officers for our protection and for the protection of the people inside so there's no confusion as about who we are, since we are in plain clothes at the time.

Q: Okay.   Very good.   So, after knocking on the door, did anyone answer?

A: Yes.

Q: And were you able to identify who that person was?

A: We were later able to identify that subject.   I believe his name was Eric Walton.   *He answered the door, opened the door, I identified myself as Dayton Police Officer, he move – he closed the door in my face and I could hear the lock being locked on the front door.*

Q: Okay.   What, if anything, did you do in response to that conduct?

A: *I repeated to knock a few more times saying, "This is Dayton*

*Police."*

\*\*\*

Q: Okay. You said that the door was shut in your face and you

heard the lock engaging. Had you heard scampering around,

activity inside the house?

A: No, I didn't hear that.

Q: Okay.

A: I remember the door being closed in my face and I could hear

the lock being activated or switched, it sounded like.

Q: Okay. After the door had initially been closed by who you

believe was Eric Walton, *how soon after that was the door then*

*opened by the Defendant, Mr. Miller?*

A: *Approximately thirty to forty-five seconds later.*

{¶ 18}   It is undisputed that the Dayton Police's "knock and advise" policy can only be classified as a consensual encounter when an occupant does not evince an intent to exercise his right to privacy in his residence. Significantly, the written procedure for the Dayton Police "knock and advise" policy specifically states that "[p]ersons are not required to comply with either the request to identify themselves or to submit to a search of the premises." "When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether [the person at the door is an officer or a private person], the occupant has no obligation to open the door or to

speak." *Kentucky v. King*, _____ U.S. _____ , 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865 (2011). The occupant, now alerted to the police presence, may even choose to open the door and speak but need not allow officers to enter and may refuse to answer questions at any time. *Id*. Moreover, "when the police knock on a door but the occupants choose not to respond or speak, *or maybe even choose to open the door and then close it,* the officers must bear the consequences of the method of investigation they've chosen." *U.S. v. Ramirez*, 676 F.3d 755 (8th Cir.2012). In other words, the police must retreat from the suspect's residence and attempt to uncover new avenues by which to continue their investigation.

**{¶ 19}** In the instant case, the record establishes that Sgt. Spiers, accompanied by four or five armed detectives dressed in tactical police gear, knocked on the door at 834 Rosedale Dr. in Dayton, Ohio. Walton opened the door, and Sgt. Spiers identified himself as a Dayton Police Officer. Rather than speak with Sgt. Spiers, Walton made the affirmative decision to shut the door and lock it. In doing so, Walton unequivocally communicated to the officers standing outside that he did not wish to speak with them nor did he want to answer any of their questions. Walton was under no obligation to speak with or allow the officers to enter the premises at that point, and chose to exercise his constitutional rights by closing the door and locking it. We note that in its appellate brief, the State attempts to characterize Walton's conduct as "evasive." The State clearly misses the point in this regard. Walton's decision to shut the door and lock it was reasonable and acceptable pursuant to the mandate of the Fourth Amendment. Sgt. Spiers' reaction to Walton's conduct, however, was unreasonable and impermissible. The police should have abandoned their effort to question the occupants of 834 Rosedale Dr. at that time; i.e. "born

the consequences of the method of investigation ... chosen" and pursued other avenues of investigation.

{¶ 20} Instead, Sgt. Spiers, accompanied by four or five additional detectives, remained on the property and knocked on the door for another forty-five seconds until Miller finally opened the door to speak with them. We also note that Sgt. Spiers repeatedly identified himself and the others as "Dayton Police" while he was knocking on the door. The actions taken by the detectives after Walton opened and shut the door were clearly coercive. This conduct clearly communicates that compliance is required, not optional. It was only by an improper and unconstitutional show of official authority that Sgt. Spiers and his fellow detectives gained entrance to the residence and discovered the evidence used to convict Miller. Accordingly, the trial court erred when it overruled Miller's motion to suppress.

{¶ 21} Finally, we note that in its decision overruling Miller's motion to suppress, the trial court found that the Dayton "police 'knock and announce [advise]' **policy** did not violate the Defendant's constitutional rights." The issue is not whether the "knock and advise" policy, itself, is constitutional, but whether the particular police conduct withstands constitutional scrutiny when an occupant responds by closing and locking the door. In fact, while noting that it is confrontational by design and "seems contrived to provoke acquiescence to the officers' requests to enter and search the premises," we have previously endorsed the "knock and advise" policy of the Dayton Police and found it to be constitutionally viable. *State v. Barber*, 2d Dist. Montgomery No. 19017, 2002-Ohio-3278. Although the policy itself is constitutional, its execution herein was not. The police conduct

herein clearly conveyed to the occupants that the only choice was to acquiesce to Sgt. Spiers' request to open the door.   Miller's Fourth Amendment rights were violated.

{¶ 22}   Miller's first assignment of error is sustained.

{¶ 23}   Miller's remaining assignments of error are as follows:

{¶ 24}   "THE TRIAL COURT ERRED IN FAILING TO IMPOSE THE THREE YEAR SENTENCE AS REPRESENTED TO APPELLANT BY THE COURT AT THE TIME OF HIS PLEA."

{¶ 25}   "IT WAS AN ABUSE OF DISCRETION TO IMPOSE MORE THAN THE MINIMUM MANDATORY FINE WITHOUT INQUIRING INTO APPELLANT'S ABILITY TO PAY."

{¶ 26}   "APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL BY TRIAL COUNSEL'S FAILURE TO FILE AN AFFIDAVIT OF INDIGENCY WHICH FAILURE RESULTED IN IMPOSITION OF A MANDATORY FINE."

{¶ 27}   In light of our disposition with respect to Miller's first assignment of error, his remaining assignments are rendered moot.

{¶ 28}   Miller's first assignment of error having been sustained, the judgment of the trial court is reversed, Miller's convictions are vacated, and this matter is remanded for proceedings consistent with this opinion.

. . . . . . . . . .

GRADY, P.J., concurs.

HALL, J., concurs in judgment.

Copies mailed to:

Kirsten A. Brandt
James S. Armstrong
Hon. Frances E. McGee