[Cite as *State v. Griffin*, 2013-Ohio-3036.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                         :

     Plaintiff-Appellee                       :           C.A. CASE NO.    25431

v.                                                   :           T.C. NO.    11CR3840/1

AARON LEE GRIFFIN                                    :           (Criminal appeal from
                                                                 Common Pleas Court)

     Defendant-Appellant                      :

                                                     :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____12th____ day of ____July____, 2013.

. . . . . . . . . .

APRIL F. CAMPBELL, Atty. Reg. No. 0089541, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

ELIZABETH C. SCOTT, Atty. Reg. No. 0076045, 120 W. Second Street, Suite 703, Dayton, Ohio 45402
     Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

     **{¶ 1}**  After the trial court denied his motion to suppress evidence, Aaron

Lee Griffin pled no contest in the Montgomery County Court of Common Pleas to manufacturing fireworks without a license, in violation of R.C. 3743.60(A), a third-degree felony. In exchange for the plea, a misdemeanor charge of possession of drug paraphernalia (a crack pipe) was dismissed. The trial court found Griffin guilty of the unlicensed manufacturing charge and sentenced him to community control for a period not to exceed five years.

{¶ 2} Griffin appeals from his conviction claiming that the trial court erred in denying his motion to suppress. For the following reasons, the trial court's judgment will be affirmed.

I.

{¶ 3} At the suppression hearing, the State presented the testimony of Sergeants John Riegel and Matthew Beavers, both of the Dayton Police Department. The evidence established the following facts:

{¶ 4} On June 30, 2011, Sgt. Riegel was working alone in uniform and driving a marked cruiser. Sgt. Beavers was also on duty in a separate cruiser. At approximately 10:41 p.m., both officers responded to 4935 Queens Avenue based on an anonymous report that two individuals at that address "were making bombs and selling them to neighborhood kids." The caller had stated that there were "a lot of bombs in the closet" and that they were being made in the garage. The officers were not dispatched to the location; each officer separately decided to investigate the call from a list of "medium to lower priority calls" on his cruiser's computer. Nevertheless, both officers arrived simultaneously and parked down the street from the Queens Avenue residence.

{¶ 5} The single-story home at 4935 Queens Avenue was located on the left side of the property, close to the street, with a small grass front yard. A black asphalt driveway ran perpendicular from the street, along the right side of the home, and to a detached garage that sat to the right of and approximately five feet behind the rear of the home. Viewed from the street, the entire width of the garage could be seen. A "relatively high" chain-link fence separated the house from the street and enclosed the property . A Google Earth street-view photograph of the front of the property was submitted as Defendant's Exhibit A. The Google photograph showed a metal driveway gate, however Sgt. Riegel testified that, if the fence were there on June 30, it "was certainly open. * * * It was not closed or locked." There was no walkway from the street to the house; the driveway was the only means to approach the house.

{¶ 6} Sgt. Riegel testified that, from the street, the officers could see lights on inside the house and that someone was in the garage. Riegel stated that the overhead garage door was open "about four feet, waist-high, maybe a little bit higher." As the officers walked on the driveway toward the garage, Riegel could see a couch and several tables or workstations with mixing bowls set up inside the garage; the person inside was moving back and forth to different mixing bowls. Riegel stated that the officers were "really focusing on the tables with the – what turned out to be explosives on them." Sgt. Beavers further testified that, before entering the garage, he could see a person walking back and forth carrying bowls and there appeared to be gunpowder on tables and "all over the garage floor." Sgt. Beavers stated that he was familiar with gunpowder from 25 years of hunting. Sgt. Riegel also testified that he and Beavers are hunters and muzzle loaders and that they were familiar with black powder and some of the powders and propellants that are used.

{¶ 7} The officers walked toward the garage to make contact with the person inside, who was later identified as Griffin. Riegel stated that, "[n]ormally we would go to the front door of the house, but from the street we could see that someone was in the garage, so we wanted to make contact with the first person we could see."

{¶ 8} The officers entered the open overhead garage door and made contact with the individual inside. The officers were not invited into the garage, and they did not have Griffin's consent to enter. Once inside, the officers could see gunpowder in the bowls, gunpowder scattered all over the floor of the garage, and more gunpowder that led out of the garage toward the back door of the house. Riegel stated that there were mixing agents and powders that "looked very similar to a lot of explosives that [the officers were] familiar with" as hunters and muzzler loaders. Sgt. Reigel further stated that there were "cigarette butts all over the place" and some scales.

{¶ 9} Griffin was not cooperative with the officers. He did not obey the officers' orders to back away from the tables. The officers handcuffed Griffin and then patted him down to make sure that Griffin did not have an ignition source on his person. A crack pipe was found in Griffin's pocket. Griffin was placed on a couch inside the garage, and Sgt. Riegel advised him of his *Miranda* rights. Griffin told the officers there were fireworks inside the house.

{¶ 10} At some point, Griffin indicated that the house belonged to his father. Sgt. Beavers went to the front door and knocked. No one responded. However, Beavers saw through a window on the porch and through the front door that, just inside the front door, there was a laundry basket that was full of what appeared to be commercial grade fireworks. Beavers eventually made contact with Griffin's father, who gave the officers consent to

search the house. The bomb squad was called to the house, and the fireworks were recovered.

{¶ 11} Griffin was subsequently indicted for possession of drug paraphernalia and manufacturing fireworks without a license. Griffin sought to suppress the evidence against him, arguing:

> [P]olice officers, acting without a warrant or exception to the warrant requirement, entered the garage at the residence of Aaron Griffin. Thereafter, police seized Defendant, searched him, and conducted a warrantless search of the premises. As a result of the search, police obtained a crack pipe, alleged explosives and chemicals, and obtained statements from Defendant. Defendant submits that items and statements obtained were the product of an unlawful search and seizure and must be suppressed.

{¶ 12} The court conducted a hearing on Griffin's motion to suppress on May 24, 2012, and the parties filed post-hearing memoranda. On August 23, 2012, the trial court issued a written entry denying the motion to suppress. The court reasoned that, after the officers saw (as they neared the garage) gunpowder strewn across the workstations and the garage floor, the officers had probable cause to enter the garage without a search warrant. The court further found that the officers were justified in entering the garage without a warrant "because (1) an emergency existed excusing the requirement of a warrant and (2) they had probable cause to believe a crime had been committed – the making of explosive devices."

{¶ 13} Griffin subsequently pled no contest to manufacturing fireworks without a

license, and he was sentenced to community control sanctions. Griffin appeals from the trial court's judgment.

II.

{¶ 14} In his sole assignment of error, Griffin claims that the trial court erred in denying his motion to suppress.

{¶ 15} In addressing a motion to suppress, the trial court assumes the role of the trier of fact. *State v. Morgan*, 2d Dist. Montgomery No. 18985, 2002 WL 63196, *1 (2002), citing *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994). The court must determine the credibility of the witnesses and weigh the evidence presented at the hearing. *Id*. In reviewing the trial court's ruling, an appellate court must accept the findings of fact made by the trial court if they are supported by competent, credible evidence. *Id*. However, "the reviewing court must independently determine, as a matter of law, whether the facts meet the appropriate legal standard." *Id.*

{¶ 16} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment was directed." (Citation omitted.) *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

{¶ 17} The curtilage of a house is the area immediately surrounding and associated with that residence. *State v. Dudley*, 2d Dist. Montgomery No. 21781, 2008-Ohio-6545, ¶ 7, citing *United States v. Oliver*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). The term "curtilage" includes "'all outbuildings used in connection with a

residence, such as garages, sheds, [and] barns * * * connected with and in close vicinity of the residence.'" (Emphasis omitted.) *United States v. Dunn*, 480 U.S. 294, 308, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), quoting *Luman v. Oklahoma*, 629 P.2d 1275, 1276 (Okla.Crim.App.1981); *State v. Howard*, 2d Dist. Greene No. 2012 CA 39, 2013-Ohio-2343, ¶ 29.

{¶ 18} "Because the curtilage of a property is considered to be part of a person's home, the right of the police to come into the curtilage is highly circumscribed. Absent a warrant, police have no greater rights on another's property than any other visitor has. The only areas of the curtilage where the officers may go are those impliedly open to the public." (Citations omitted.) *State v. Peterson*, 173 Ohio App.3d 575, 2007-Ohio-5667, 879 N.E.2d 806, ¶ 17 (2d Dist.).

{¶ 19} The police generally are free to observe whatever may be seen from a place where they are entitled to be. (Citations omitted.) *State v. Buzzard*, 112 Ohio St.3d 451, 2007-Ohio-373, 860 N.E.2d 1006, ¶ 15. Thus, an officer's "mere observation of an object in plain view does not constitute a search" if it occurs from a lawful vantage point. *Id.* at ¶ 17. Whatever a person voluntarily chooses to expose to public view loses its Fourth Amendment protection. *Id*. at ¶ 15, citing *California v. Ciraolo*, 476 U.S. 207, 213, 106 S.Ct. 1809, 1812-13, 90 L.Ed.2d 210 (1986).

{¶ 20} Initially, we note that the officers' entry onto the property via the driveway was lawful. Although a fence surrounded the property, separating the house from the street, the driveway gate was open (assuming it existed on the date in question), and the driveway provided the only entrance onto the property. There was no evidence of any "no

trespassing" signs or similar indications that all or part of the driveway was not open to the public. Based on the officers' testimony, the driveway was implicitly open to the public as the means to approach the house.

{¶ 21} Both officers testified that the driveway led to a detached garage, which was located to the right of and approximately five feet to the rear of the house. As the officers walked up the driveway, they could see, through the partially opened overhead garage door, an individual moving around, as well as tables/workstations and mixing bowls. The officers decided to make contact with the individual inside the garage, rather than knock on the front door of the house. As a result of this decision, the officers proceeded down the driveway along the right side of the house to the garage.

{¶ 22} Under the circumstances of this case, we find no fault with the officers' decision to approach the garage. The garage was detached from, but adjacent to, the house, and the front of the garage was visible from the street. A fence ran along the front of the property separating the house from the street, but once the officers walked through the open driveway gate, nothing restricted their approach to the garage. The garage light was on, the garage door was half-open, and the officers could see from the street that someone was moving inside the garage. Although a television was on inside the house, it reasonably appeared to the officers that a resident was inside the garage. Given the location of the garage compared to the house, the fact that the officers could approach the garage without going through a closed gate or other obstruction, and the fact that a resident appeared to be inside the garage, the officers reasonably initiated contact with the resident at the garage.

{¶ 23} Before entering the garage, the officers could see several tables or

workstations with mixing bowls and that the person inside was moving back and forth to different mixing bowls. In addition, the officers saw gunpowder on the tables and "all over the garage floor." The trial court concluded that, at this juncture, the officers had probable cause to believe that the resident was illegally making explosive devices and that "an emergency existed" justifying the officers' entry into the garage.

{¶ 24} On appeal, Griffin contends that the officers lacked probable cause that an offense had been committed and that no exigent circumstance existed that justified the officers' entry into his garage. He notes that the record reflects that he was unaware of the officers' approach and that the officers did not call the bomb squad until after they entered the garage.

{¶ 25} It is a basic principle of Fourth Amendment law that searches and seizures inside a person's home without a warrant are presumptively unreasonable. *Kentucky v. King*, – U.S. –, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011); *Payton*, 445 U.S. at 586, 100 S.Ct. 1371, 63 L.Ed.2d 639. In general, searches within a home must be pursuant to a warrant supported by probable cause to believe that a crime has been or is being committed. *E.g.*, *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). However, the United States Supreme Court has recognized limited exceptions to both the warrant and probable cause requirements, emphasizing that "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). *See also Griffin*, *supra*. The State has the burden of showing the validity of a warrantless search. *State v. Hilton*, 2d Dist. Champaign No. 08-CA-18, 2009-Ohio-5744, ¶ 21-22, *citing Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524

N.E.2d 889 (1988).

**{¶ 26}** One such exception is the community caretaking/emergency aid exception, which "allows police officers to stop a person to render aid if they reasonably believe that there is an immediate need for their assistance to protect life or prevent serious injury." *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, 964 N.E.2d 1037, ¶ 22; *see Michigan v. Fisher*, 558 U.S. 45, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009). Under this exception, police officers may make a warrantless entry into a home when (1) the police have "reasonable grounds to believe that there is immediate need" to protect the lives or property of themselves or others; (2) the circumstances, as viewed objectively, justify the warrantless entry; and (3) there is a reasonable basis, short of probable cause, to associate the place to be searched with an emergency. *State v. Baker*, 9th Dist. Summit No. 23713, 2009-Ohio-2340, ¶ 7; *accord Dunn* at ¶ 19-22. "Anonymous tips, when corroborated by other factors, events or circumstances, may provide the requisite reasonable grounds to justify the warrantless entry." *Baker* at ¶ 7; *see also State v. Hunter*, 2d Dist. Montgomery No. 24350, 2011-Ohio-6321, ¶ 29 ("[W]hen an anonymous tip includes a report that a victim is in physical peril, some corroboration is required to justify a warrantless entry into a residence, but not much corroboration.").

**{¶ 27}** We commented in *State v. Sharpe*, 174 Ohio App.3d 498, 2008-Ohio-267, 882 N.E.2d 960 (2d Dist.), that "when there is positive, specific evidence supporting a reasonable belief that a building contains an unsecured firearm that could pose a danger to the officers or other members of the public who are present inside that building or on the scene, exigent circumstances based upon public safety concerns may justify a warrantless

entry to retrieve the weapon." *Sharpe* at ¶ 49. This comment is apposite to the circumstances before us.

{¶ 28} In this case, the officers were responding to an anonymous report that two individuals were making "bombs" in the garage at 4935 Queens Avenue, that the bombs were being given to neighborhood children, and that some were located in a closet inside the house. Consistent with that report, the officers observed Griffin in his garage moving between various workstations with mixing bowls. Upon approaching the garage, the officers saw gunpowder on the tables; Sgt. Riegel testified that he also observed "explosives." Riegel testified that he was concerned that there were explosives inside the garage that posed a danger to the officers and other people in the area. The officers' observations from outside the garage of the gunpowder, the workstations, Griffin's actions, and the "explosives" inside the garage sufficiently corroborated the anonymous report that bombs were being made in the garage at 4935 Queens Avenue.

{¶ 29} While we may question whether, before the officers entered the garage, there was probable cause to believe a crime was being committed (thus triggering consideration of whether a warrant was required), such determination is not controlling in an analysis of the community caretaking exception to the Fourth Amendment. *See*, *e.g.*, Kinports, *Diminishing Probable Cause and Minimalist Searches*, 6 Ohio St. J. Crim. L. 649 (2009). Considering the totality of the circumstances, the officers reasonably entered the garage to ensure that Griffin and the apparent explosives within the garage did not pose an immediate danger to the officers and others in the area.

{¶ 30} By our conclusion, we do not suggest that every corroborated report of a

dangerous weapon or ordnance is sufficient to justify a warrantless entry into a home to retrieve the weapon. *See, e.g., State v. Boyd*, 2d Dist. Montgomery No. 25182, 2013-Ohio-1067, ¶ 30; *Sharpe*, 174 Ohio App.3d 498, 2008-Ohio-267, 882 N.E.2d 960, at ¶ 50 ("[T]he mere fact that a firearm may be located within a private home is not, by itself, sufficient to create an exigent or emergency circumstance. * * * What must be present is a risk of danger from its use."). Rather, under the specific circumstances involved in this case, the officers' warrantless entry into the garage was justified by the community caretaking/emergency aid exception due to the officers' reasonable belief that Griffin was actively making bombs inside the garage and posed an immediate danger to the officers and the public.

{¶ 31} The trial court did not err in denying Griffin's motion to suppress. Griffin's assignment of error is overruled.

III.

{¶ 32} The trial court's judgment will be affirmed.

. . . . . . . . . .

FAIN, P.J. and WELBAUM, J., concur.

Copies mailed to:

April F. Campbell
Elizabeth C. Scott
Hon. Steven K. Dankof