[Cite as *State v. Gardner*, 2013-Ohio-2015.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 25312 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2011-CR-2773 |
| v. | : | |
| | : | |
| REGINALD B. GARDNER, JR. | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 17th day of May, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by R. LYNN NOTHSTINE, Atty. Reg. #0061560, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

ADELINA E. HAMILTON, Atty. Reg. #0078595, Law Office of the Public Defender, 117 South Main Street, Suite 400, Dayton, Ohio 45422
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1}    Reginald Gardner appeals from his conviction and sentence following a

no-contest plea to one count of heroin possession.

{¶ 2}    In his sole assignment of error, Gardner contends the trial court erred in overruling his motion to suppress the heroin.

{¶ 3}    The facts underlying the present appeal are set forth in the trial court's decision, entry, and order overruling the motion. In making its factual findings, the trial court credited the testimony of police officer David House. In pertinent part, the trial court's findings are as follows:

David House ("Officer House") has been a police officer with the Dayton Police Department for 20 years. Officer House has been in his current assignment since July of 2010 and before that he was in the Narcotics Bureau as a Detective for 13 years. During that time, Officer House observed and made arrests for drugs "thousands" of time[s].

On August 10, 2011, Officer House was on patrol from 11:00 P.M. to 7:00 A.M. and in a marked cruiser. That night, Officer House responded to a dispatch about a "breaking and entering" at 443 Harriett Street. Officer House is familiar with the Harriett Street area because he has made arrests for narcotics there in the past and the police department had been receiving complaints about vehicle-to-vehicle drug transactions in this area. The call about the "breaking and entering" came in through an anonymous caller who said that there were two black males going in and out of a vacant house at 443 Harriett Street and that there was a dark colored pick-up truck in the driveway. When Officer House pulled into the 400 block of Harriett Street, he was looking for the specific address, and observed a dark green Ford Expedition in

the driveway between 441 Harriett Street and the house immediately to the west of 441 Harriett Street. Officer House testified that there were no lights on in the house, the grass was slightly overgrown, and it appeared that the house could have been vacant but it was not "boarded up." Officer House testified that he observed a black male standing outside the open passenger door of the dark green Ford Expedition. The black male was later identified as Reginald B. Gardner, Jr. (the "Defendant").

Officer House stopped his vehicle at the curb and exited the cruiser, at which time the Defendant sat back in the front passenger seat. However, the Defendant did not get all the way in the vehicle, he just sat on the seat with his feet on the ground outside the vehicle. Officer House approached the Defendant and asked if he lived there and the Defendant said that it was his father's house. As Officer House continued to speak with the Defendant, he observed that the Defendant was sitting "very awkwardly" in the seat. The Defendant had his upper body turned towards the seat, as if he was turning around to speak with someone in the back of the vehicle. Officer House observed that the Defendant's right hand was between him and the back of the seat, reaching back behind him toward the center console area, and moving his arm around as if he was trying to find something or trying to manipulate something without looking. Officer House testified that the Defendant "remained in that awkward position" while they spoke.

Officer House had some concerns about the Defendant's behavior

because he still did not know whether the Defendant was supposed to be at the house or if there was a "breaking and entering" occurring. Because of this, and with the way the Defendant was acting, Officer House was fearful the Defendant was trying to retrieve a weapon. Officer House then put his hand on his duty weapon and asked the Defendant to step out of the vehicle. The Defendant turned even further toward the back of the vehicle and reached to the back of the vehicle with his right hand and then proceeded to get out of the vehicle and Officer House observed that the Defendant's right hand was empty. Based on the complaint, and the Defendant's movements and actions, Officer House proceeded to pat down the Defendant.

While Officer House was conducting the pat down, the Defendant's father, Reginald Gardner, Sr. (the "Father") came out of the house and said "here I am." Officer House completed the pat down and did not recover any evidence. Officer House escorted the Defendant down the driveway and secured the Defendant in the back of his police cruiser. Officer House asked the Defendant what he tossed into the back of the vehicle, and the Defendant responded that he did not know what Officer House was talking about. Officer House then closed the door of the police cruiser and returned to the passenger side of the Ford Expedition where the passenger door was still standing open. Officer House looked inside the vehicle where the Defendant had been reaching to ensure there were no weapons, because he was still investigating the possibility of a break-in, and although the Defendant was secured in the

police cruiser, the Father was still outside of the house. As Officer House leaned into the vehicle, he could see between the seats in the back of the vehicle on the passenger side floorboard where there was a baggie containing 56 gel capsules. Officer House reached through the seats and recovered the baggie and secured it in his pocket and then looked underneath the seat to check for weapons.

Officer House then spoke with the Father and asked for identification. Officer House explained why he was there to the Father and told him that the Defendant was under arrest. Officer House found out that the Father owned the Ford Expedition. The Father showed Officer House that he had keys to the front door. Officer House returned to the cruiser with the Father's identification and spoke with the Defendant and checked them for [being] wanted and prior history. Officer Jennifer Stack ("Officer Stack") then arrived on the scene. Officer House tested the capsules for heroin with a marquis testing kit and the capsules tested positive for heroin. At that time, Officer House advised the Defendant that he was under arrest and secured him in handcuffs. Officer House then returned to the police cruiser and asked the Defendant if he wanted to talk about the incident and the Defendant said that he did not want to talk to Officer House. For this reason, Officer House did not give Miranda warnings to the Defendant nor did he ask about the drugs. The Defendant made statements while he was in custody but not as a result of any questions asked by Officer House.

(Doc. #18 at 1-3).

{¶ 4}     Based on the foregoing facts, the trial court found (1) that Officer House had reasonable, articulable suspicion of criminal activity to justify briefly detaining appellant Gardner, (2) that House's pat-down search of Gardner was lawful, (3) that House observed the baggie of heroin in plain view, and (4) that House's discovery of the heroin gave him probable cause to arrest Gardner. As a result, the trial court overruled the suppression motion. (*Id*. at 4-9).

{¶ 5}     Following the trial court's ruling, Gardner pled no contest to heroin possession, a third-degree felony. The trial court found him guilty and sentenced him to community control. This appeal followed.

{¶ 6}     In his lone assignment of error, Gardner challenges the trial court's suppression ruling. He contends the trial court erred in finding reasonable, articulable suspicion of criminal activity to justify an investigatory detention. He also claims the trial court erred in finding that the baggie of heroin was in plain view. He maintains that the baggie was discovered through a search and that his furtive movements alone were not enough to justify a protective search for weapons. Finally, he argues that the search violated *Arizona v. Gant*, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009).

{¶ 7}     "In reviewing a decision of a trial court on a motion to suppress, an appellate court gives broad deference to a trial court's findings of fact. * * * But whether the facts found by the trial court justify suppression of the evidence is a question of law subject to de novo review." *State v. Anderson*, 2d Dist. Montgomery No. 24678, 2012-Ohio-441, ¶ 10. Here the trial court's factual findings are supported by Officer House's suppression-hearing testimony.

Applying those facts to the legal issues before us, we find, for the reasons below, that the trial court correctly overruled Gardner's motion.

{¶ 8} As a threshold matter, we conclude that Officer House had reasonable, articulable suspicion of criminal activity to justify removing Gardner from the SUV and detaining him under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). An officer briefly may detain an individual without an arrest warrant or probable cause for an arrest to investigate if the officer has reasonable suspicion of criminal activity. To do so, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *State v. Andrews*, 57 Ohio St.3d 86, 87, 565 N.E.2d 1271 (1991), quoting *Terry* at 21. The propriety of an investigative stop must be viewed under the totality of the circumstances, which themselves must "be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *State v. Bobo*, 37 Ohio St.3d 177, 179, 524 N.E.2d 489 (1988).

{¶ 9} On appeal, Gardner asserts that an uncorroborated, anonymous tip is not enough to justify a *Terry* stop or detention. We do not disagree. "A tip from an anonymous informant, standing alone, is generally insufficient to support reasonable suspicion of criminal activity, because it lacks the necessary indicia of reliability." *State v. Jordan*, 104 Ohio St.3d 21, 2004-Ohio-6085, 817 N.E.2d 864, ¶36. In the present case, however, House did not rely solely on an unverified tip from an anonymous source when he detained Gardner.

{¶ 10} As set forth above, an anonymous caller reported that two black males were entering and exiting a vacant residence at 443 Harriett Street and that a dark-colored pick-up

truck was in the driveway. House arrived at the scene around 11:30 p.m. and saw a dark-colored SUV in a driveway near 441 Harriett Street and 443 Harriett Street. The driveway ran between the two houses, which sat approximately ten feet away on each side of it. (Suppression Tr. at 8). Although House did not know it, the driveway actually belonged to the residence at 441 Harriett Street. (*Id*. at 27-28). He could not see any house numbers, however, and the residence at 441 Harriett Street appeared to be vacant. The front of the house was dark, the grass was a little overgrown, and he did not recall there being any window coverings. (*Id*. at 9). Other than the dark-colored SUV, no other vehicles were present. (*Id*. at 28). House also observed two black males. He initially saw appellant Gardner standing outside the parked SUV. He later saw Gardner's father exit the residence at 441 Harriett Street.

{¶ 11} House's observations admittedly did not confirm the anonymous caller's assertion of a breaking and entering in progress. Before he seized Gardner, however, House did corroborate the caller's information insofar as he saw (1) a dark-colored vehicle parked next to the reported address, (2) what appeared to be a vacant house, and (3) a black male present.[1] But because this partial corroboration did little to confirm the anonymous caller's

---

[1] With regard to corroboration, the trial court reasoned in part: "The SUV was sitting in the driveway of 441 Harriett Street, which this Court finds is close enough in proximity to 443 Harriett Street to corroborate that anonymous tip. Additionally, the dark colored 'pick-up truck' was an SUV, which this Court finds to be close to the description from the anonymous caller." (Doc. #18 at 5). We agree with the trial court's reasoning. As noted above, the driveway was directly between the two houses, the house numbers were not clear, and no vehicles other than the SUV were present. During the suppression hearing House explained: "As I'm pulling up, I'm in the area as described in the dispatch call where they're saying it's a—a house, again, 441, 43, in that area, where there's a dark-colored—described as a pick-up truck. I see a dark-colored SUV sitting in the driveway with a black male standing next to it. Obviously I would not be doing my job if I just dismissed everything, saying 'Well, the call says 443, this is 441. Even though the houses are side by side, the call says it's a pick-up truck; however, this is an SUV. The call says there's two black males; I only see one black male. If I just drive on through, then obviously I'm not doing my job. I did stop to investigate * * *." (Suppression Tr. at 26-27).

assertion of illegality, the corroboration *alone* was not enough to give House a reasonable, articulable suspicion of criminal activity. *Jordan* at ¶42.

**{¶ 12}** Significantly, however, House did not base his decision to detain Gardner solely on the partially corroborated tip. As House approached the SUV, Gardner sat down in the front passenger seat with his feet on the ground and his upper body twisted awkwardly toward the rear of the vehicle. (Suppression Tr. at 10). Gardner kept reaching back out of sight and moving his arm around as if "tying to find something or manipulating something without trying to look at it." (*Id*. at 11). At that point, House had not confirmed whether Gardner was legitimately at the residence, whether a breaking and entering was in progress, or whether another crime was occurring. (*Id*.) Gardner's behavior caused House to fear he was trying to retrieve a weapon. (*Id.*). We note that up to this point, House's contact with appellant, and any observations made, were the result of a consensual encounter which does not implicate the Fourth Amendment. When House asked Gardner to step out of the vehicle, Gardner responded by turning "even further toward the back of the vehicle and reach[ing] further into the vehicle with his right hand." (*Id*.). Gardner then stepped out of the vehicle with empty hands. (*Id*. at 12).

**{¶ 13}** It is well settled that a defendant's furtive gestures may be considered in assessing whether police had reasonable, articulable suspicion of criminal activity to justify an investigatory detention or search. *State v. Abner*, 194 Ohio App.3d 523, 2011-Ohio-4007, 957 N.E.2d 72, ¶12, 15 (2d Dist.). Even though furtive gestures alone typically are not enough, they "can be considered in making a totality-of-the-circumstances determination." *Id.* at ¶12. Here House was entitled to consider Gardner's unusual body position and furtive gestures, as

well as the fact that Gardner was waiting outside what appeared to be a vacant house near midnight.

{¶ 14} House also was entitled to consider his personal knowledge that Harriett Street was a site of frequent criminal activity, including drug sales.[2] (Suppression Tr. at 6). *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. * * * But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis.").

{¶ 15} Based on the totality of the circumstances, of which the anonymous breaking and entering tip was a part, the time of night, the nature of the area, the observation of Gardner outside an apparently vacant residence, and Gardner's furtive movements when approached, we believe Officer House possessed reasonable, articulable suspicion of criminal activity to justify a brief investigation under *Terry*. Therefore, he lawfully ordered Gardner out of the SUV.

{¶ 16} After Gardner exited the vehicle, House performed a pat-down but found nothing. Because the pat-down produced no evidence, we need not address whether it was

---

[2]Although the anonymous caller had reported a breaking and entering rather than a drug transaction, the fact that Harriett Street was a high-crime area remained a relevant consideration. When he encountered Gardner, House had not yet determined what crime, if any, was occurring.

permissible. Following the pat-down, House placed Gardner in his police cruiser without handcuffs while he investigated further. House returned to the passenger side of the SUV, where the door remained open. (Suppression Tr. at 12-13). He "leaned" inside the vehicle and looked to be sure Gardner had not been reaching for a weapon. (*Id*. at 13). While doing so, he "could see from between the seats, lying on the back passenger side floorboard was a baggie" containing 56 heroin capsules. (*Id*.). House retrieved the baggie and examined the passenger area further to be sure no weapon was present. (*Id*. at 14).

{¶ 17}   In its ruling, the trial court held that House lawfully had observed the baggie of heroin "in plain view." Gardner argues on appeal that the plain-view doctrine does not apply because House unlawfully intruded into the vehicle in order to see the baggie. Gardner reasons that House's act of leaning into the SUV constituted an unauthorized search under the Fourth Amendment.

{¶ 18}   For the plain-view doctrine to apply, two requirements must be satisfied: "(1) the initial intrusion must be lawful or the officer must properly be in a position where he can view the particular area, and (2) it must be immediately apparent to the officer that the items he observes may be evidence of a crime, contraband, or otherwise subject to seizure." *State v. Pitts*, 2d Dist. Montgomery No. 18964, 2001 WL 1473789, *1 (Nov. 21, 2001).

{¶ 19}   In *Pitts*, this court held that an officer's act of leaning into a stopped vehicle did not constitute a "search." This court reasoned:

> * * * Pitts argues that the State is unable to meet the first prong of the
> plain view test because Officer Orndorff leaning into the car with his flashlight
> to attempt to view the area between the seat and the console was an unlawful

search. Thus, Ms. Pitts argues that Officer Orndorff was not lawfully intruding into her vehicle and therefore his leaning into the vehicle was an unlawful search. * * * We cannot agree that there exists an invisible boundary line around the interior of a vehicle which the police officers may not cross. Therefore, we determine that leaning into a vehicle and illuminating the interior is not a search. Thus, the State also meets the first prong of the plain view doctrine as Officer Orndorff was lawfully and properly in a place when he observed the crack cocaine.

*Id.* at *2.

{¶ 20} This court expressly followed *Pitts* in *State v. Lungs*, 2d Dist. Montgomery No. 22704, 2008-Ohio-4928. In *Lungs*, an officer leaned into a van that contained injured dogs and dog-fighting paraphernalia. Citing *Pitts*, this court found that the officer's act of leaning into the van did not constitute a search. According to the *Lungs* panel, "the fact that [the officer] leaned into the van and utilized a flashlight in observing the evidence [did] not elevate his conduct to a search, and it [did] not negate the fact that the items were otherwise openly visible." *Id.* at ¶24.

{¶ 21} *Pitts* and *Lungs* support the trial court's determination that the baggie of heroin was in plain view despite House's act of leaning into the SUV to see it. In adherence to stare decisis, we will follow *Pitts* and *Lungs*. Therefore, we reject Gardner's argument that leaning into the SUV constituted a search and that the baggie was not in plain view.[3]

---

[3] We note that *Pitts* cited no authority for its rejection of "an invisible boundary line around the interior of a vehicle which the police officers may not cross." Not all courts have rejected such a boundary. In *U.S. v. Montes-Ramos*, 347 Fed. Appx. 383, 389-390 (10th Cir.2009), the Tenth Circuit Court of Appeals held that "a police officer's intentional act of intruding a vehicle's air space, even if by only a

**{¶ 22}** In any event, even if we assume, arguendo, that House engaged in a search when he leaned into the SUV, the search was permissible. "[P]olice may search the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, if an officer possesses a reasonable belief that an individual is dangerous and may gain immediate control of weapons located in the vehicle upon returning to it." *State v. Walker*, 2d Dist. Montgomery No. 24542, 2012-Ohio-847, ¶28. In *Walker*, this court addressed the legality of a protective search for weapons when the occupants of a vehicle made furtive movements during a traffic stop. In finding the search permissible, this court reasoned:

> * * * Detective House, a lone officer, initiated a traffic stop after dark in a high crime area. He testified that, after he activated his flashing lights, shone a flashlight into the van, and identified himself as a police officer, he observed Walker and Burcham frantically moving their hands near the floorboard, out of the officer's sight. The men did not immediately respond to his commands that they show their hands. The detective stated that he had concerns that they might "come up with a weapon." Under the totality of the circumstances, Detective House had a reasonable basis to believe that Walker or Burcham may have been armed and/or that a weapon may have been hidden in the front passenger

---

few inches, constitutes a search within the meaning of the Fourth Amendment." Likewise, in *U.S. v. Powell*, 483 F.3d 836, 838 (D.C. Cir.2007), the District of Columbia Circuit Court of Appeals characterized an officer's act of leaning his head into a stopped car as an unauthorized "search" and found the plain-view doctrine inapplicable. *See also State v. Newsome*, 8th Dist. Cuyahoga No. 93328, 2010-Ohio-2891, ¶33 (McMonagle, J., dissenting) ("Finally, I disagree with the majority's conclusion summarily finding that the drugs in question were in plain view. Officer Lentz testified that after removing the female passenger from the car, he leaned inside and did a 'safety search' * * * ; it was only then that the officer observed a plastic bag containing small individual bags of crack cocaine in the cup holder of the rear portion of the center console of the car. This was not plain view; it was a search.").

area of the van. Accordingly, House was entitled to conduct a limited protective search for weapons for his safety.

The lawfulness of House's protective search of the passenger area of the vehicle was not limited by the fact that the men were handcuffed and seated on the curb when the search occurred. House testified: "After checking the area where these individuals had been reaching, if nothing had been discovered, Mr. Burcham would have been issued a citation for driving with an expired license plate. And both individuals would have been allowed to leave." Considering that, at the time of the search, it was likely that one, if not both, of the occupants would be permitted to return to the van, House acted reasonably when, out of a concern for the officers' safety, the van was searched for weapons prior to allowing Burcham and Walker to re-enter the vehicle.

*Id.* at ¶30-31.

{¶ 23} We reach the same conclusion in this case, which coincidentally involves the same officer. Working alone while investigating a reported breaking and entering, House approached a parked SUV near midnight in a high crime area. He observed Gardner standing next to the vehicle outside an apparently vacant residence. Gardner proceeded to sit down in the passenger seat while reaching back and moving his arm around as if to locate something. House feared that Gardner was trying to retrieve a weapon. When asked to step out of the vehicle, Gardner did not immediately comply. Instead, he reached even further with his hand. Under these circumstances, House reasonably believed Gardner may have been attempting to retrieve a weapon. Accordingly, he was entitled to conduct a protective search for his safety.

{¶ 24} As in *Walker*, our conclusion is not altered by Gardner's detention in a police cruiser when House conducted the protective search. Although Gardner was being detained, his father also had stepped outside. At that time, House did not know whether a crime was occurring or what Gardner's father would do. (Suppression Tr. at 13). Additionally, House testified that Gardner was not under arrest and would have been permitted to return to the SUV if heroin had not been discovered. (*Id*. at 17). Under these circumstances, House acted reasonably when, out of a concern for his safety, he searched the vehicle for weapons prior to allowing anyone to re-enter it.

{¶ 25} Finally, we reject Gardner's argument that House violated *Arizona v. Gant*, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), when he found the baggie of heroin in the SUV. *Gant* addressed whether the search-incident-to-arrest exception to the Fourth Amendment's warrant requirement allowed a vehicle search after a driver was arrested and placed in a patrol car. Here Gardner was not under arrest when House observed the baggie. House arrested Gardner only after discovering the heroin. (Suppression Tr. at 16). As there was no search incident to arrest, *Gant* does not apply.

{¶ 26} Based on the reasoning set forth above, we overrule Gardner's assignment of error and affirm the judgment of the Montgomery County Common Pleas Court.

. . . . . . . . . . . . .

DONOVAN, J., concurs.

FROELICH, J., concurring:

{¶ 27} The officer had the right to approach the Appellant and ask him to step away from the vehicle. I question placing the Appellant in the cruiser, but there apparently was nothing found as a result of this action.

{¶ 28}   There is no discussion of how far the officer "leaned" inside the vehicle; we have held in *Pitts* and *Lungs* that merely "breaking the close" does not constitute a search.   At the same time, an officer's entering the vehicle and then finding something in "plain view" would be prohibited; the burden is on the State to prove that the officer's observations of the drugs were made from a place where the officer lawfully was.   The trial court determined that the officer simply was "leaning into the vehicle" and "was not unlawfully intruding into" the vehicle.   With the record before us, I cannot say the court erred.

. . . . . . . . . .

Copies mailed to:

Mathias H. Heck
R. Lynn Nothstine
Adelina E. Hamilton
Hon. Dennis J. Adkins