[Cite as *State v. Williamson*, 2014-Ohio-325.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                          :

    Plaintiff-Appellee             :          C.A. CASE NO.    25479

v.                                     :          T.C. NO.    12CR865/1

JULIUS M. WILLIAMSON                   :          (Criminal appeal from
                                                  Common Pleas Court)

    Defendant-Appellant            :

                                       :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____31st____ day of ____January____, 2014.

. . . . . . . . . .

APRIL F. CAMPBELL, Atty. Reg. No. 0089541, Assistant Prosecuting Attorney, 301 W.
Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

MICHAEL T. COLUMBUS, Atty. Reg. No. 0076799, 2100 First National Plaza, 130 W.
Second Street, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, P.J.

{¶ 1}     Julius M. Williamson was convicted, after a jury trial in the Montgomery

County Court of Common Pleas, of attempted aggravated burglary (with a firearm specification), tampering with evidence, and having a weapon while under disability. The trial court imposed an aggregate sentence of 10½ years in prison.

{¶ 2} Williamson appeals from his conviction, claiming that the trial court erred in denying his motion to suppress evidence, that his convictions were based on insufficient evidence and were against the manifest weight of the evidence, and that the trial court failed to make the required statutory findings before imposing consecutive sentences. For the following reasons, Williamson's sentence will be reversed, and the matter will be remanded for the trial court to consider whether consecutive sentences are appropriate under R.C. 2929.14(C)(4) and, if so, to enter the proper findings on the record. In all other respects, the trial court's judgment will be affirmed.

## I. Motion to Suppress Williamson's Statements as
## Fruit of an Unlawful Arrest

{¶ 3} Williamson's first assignment of error states:

THE TRIAL COURT ERRED IN FAILING TO SUPPRESS DEFENDANT'S STATEMENTS MADE AFTER HIS ARREST.

{¶ 4} In his first assignment of error, Williamson claims that he was arrested without probable cause and, accordingly, the trial court should have suppressed the statements he made to an officer at the scene and to a detective the following day.

{¶ 5} "In addressing a motion to suppress, the trial court assumes the role of the trier of fact. The court must determine the credibility of the witnesses and weigh the evidence presented at the hearing. In reviewing the trial court's ruling, an appellate court

must accept the findings of fact made by the trial court if they are supported by competent, credible evidence. However, 'the reviewing court must independently determine, as a matter of law, whether the facts meet the appropriate legal standard.'" (Citations omitted.) *State v. Griffin*, 2d Dist. Montgomery No. 25431, 2013-Ohio-3036, ¶ 15.

{¶ 6} Police Officers Steven Bauer and Daniel Reynolds and Detective Gary Engel of the Dayton Police Department testified for the State at the suppression hearing. Their testimony established the following facts.

{¶ 7} At approximately 11:00 p.m. on March 17, 2012, Officer Bauer heard a dispatch for an aggravated burglary concerning the area of 324 Richmond Avenue and 807 Harvard Boulevard. The dispatch stated that three subjects were at 324 Richmond with guns; Bauer testified that the dispatch mentioned that "the address of 807 Harvard was also involved in this."[1] 801 Harvard Boulevard, at the corner of Harvard and Richmond, is directly across the street from 324 Richmond Avenue. 807 Harvard Boulevard is adjacent to 801 Harvard, one house from the corner. Bauer testified that 807 Harvard was approximately 150 feet from 324 Richmond Avenue, and that a person could see 324 Richmond from the rear of 807 Harvard. The homes on these streets are elevated several feet above street level.

{¶ 8} Bauer was "extremely familiar" with these streets. He testified that police officers have "received lots of complaints at those residences from upper command staff and from citizens." In the past two years or so, Bauer had responded to roughly four or five

---

[1] At trial, Officers Bauer and Reynolds testified that the dispatch indicated that individuals with guns tried to kick in a door at 324 Richmond, that the subjects fled the scene, and that the subjects resided at 807 Harvard. However, these details were not before the court at the suppression hearing.

weapons-related calls from that vicinity, and the residents of 807 Harvard were suspects in a prior shooting incident.

{¶ 9} Officer Bauer heard that two cruisers were responding to the dispatch, and he "added himself to the call" due to the involvement of weapons and multiple suspects. Bauer and another officer, Officer Drumm, arrived approximately three minutes later and parked on the east side of 801 Harvard Boulevard, along Richmond Avenue; Bauer stated that his cruiser was not visible from 807 Harvard Boulevard. Two other cruisers had already responded to 324 Richmond to check on injuries and to gather information there.

{¶ 10} Officer Bauer advised the other officers that he was going to observe the front of 807 Harvard while Officer Drumm watched the rear of that house. From the elevated front yard on the east side of 801 Harvard (along Richmond), Bauer saw a man, later identified as Williamson, run out of the front door of 807 Harvard, enter the front passenger seat of a green Pontiac Bonneville parked in front of the house, and close the door. Officer Bauer did not see anything in Williamson's hands while Williamson was going to the car, and Bauer had only a limited view of Williamson's upper body while Williamson was in the vehicle. Bauer saw Williamson reach toward his waistband, move his shoulders "up and down like he was trying to dig something out," and lean into the back of the car with his upper body "extended completely into the rear compartment." Within 10 or 15 seconds, Williamson got out of the car and hurried back toward the front door of 807 Harvard.

{¶ 11} Based on his ten years of experience as a police officer, Officer Bauer had concerns that Williamson was trying to conceal a weapon. Bauer advised Officer Drumm that he was going to make contact with Williamson. While Williamson was heading back

to 807 Harvard, Bauer ordered Williamson, at gunpoint, to show his hands. Bauer placed Williamson in handcuffs and secured him in the cruiser of Officer Alley, who had also arrived at the scene.

{¶ 12} Hearing Bauer's commands to Williamson, several people came out of 807 Harvard, the first two being men. Bauer began to search the car to make sure there were no weapons in it, however he did not complete the search because of the number of people gathering outside.

{¶ 13} When Officer Reynolds arrived with his canine partner, there were "people pouring out of the front door of 807 Harvard." Reynolds testified that the officers there "were just trying to corral people and find out what's going on." Reynolds was informed about Williamson's actions in the Pontiac, and he testified that, for safety reasons, it was important to him to secure any weapons in the area that others might access. He asked Bauer if the vehicle had been cleared. When Officer Bauer responded that he had only looked in certain areas, Reynolds conducted a more complete search.

{¶ 14} Officer Reynolds recovered a loaded handgun from the trunk of the vehicle, which was also accessible from the pull-down armrest in the middle of the rear seat. Reynolds testified that the gun was right next to the opening and was lying in such a manner that the grip of the gun would have been close to the rear seat and the barrel would have been facing the trunk of the car. Reynolds also collected a black neoprene mask and black knit cap from the front passenger seat.

{¶ 15} Officer Bauer testified that he believed Officer Alley informed Williamson of his *Miranda* rights while at the scene. Bauer did not observe anyone ask Williamson

questions. After the gun was located and Bauer informed Williamson that he was being charged with carrying a concealed weapon, Williamson "swore on his children that the handgun wasn't his." Later, as Williamson was being booked into the jail, Williamson stated that he had seen the police cruisers pulling up on the side of 801 Harvard and outside 324 Richmond.

{¶ 16} On the morning of March 19, 2012, Detective Engel interviewed Williamson at the police station for 44 minutes regarding the events of March 17. At the beginning of the interview, Engel informed Williamson of his *Miranda* rights using a waiver-of-rights form. Williamson indicated that he understood his rights, and he agreed to talk to the detective.

{¶ 17} Williamson was later indicted on attempted aggravated burglary with a firearm specification, tampering with evidence, and having a weapon while under disability. Williamson moved to suppress all evidence and statements obtained from him. He asserted that the police lacked a reasonable suspicion to detain him and probable cause to arrest him. He further asserted that his statements were obtained in violation of his Fifth Amendment rights.

{¶ 18} The trial court overruled the motion, finding that Officer Bauer's decision to stop Williamson was reasonable, given the nature of the dispatch, Williamson's actions in the vehicle, the time of day, and the "chaotic" scene. The court further determined that Williamson's statement at the scene was constitutional, as no questions had been asked, and that his statements at the police station were obtained in accordance with *Miranda*.

{¶ 19} On appeal, Williamson asserts that his incriminating statements should have

been suppressed, because he was arrested without probable cause. He emphasizes that Officer Bauer did not observe anything in Williamson's hands or see Williamson commit any criminal activity, that Williamson had not been identified as a suspect in the dispatch, and that Bauer had only a limited view of Williamson's actions in the vehicle.

{¶ 20} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. *State v. Martin*, 2d Dist. Montgomery No. 20270, 2004-Ohio-2738, ¶ 10, citing *Terry*. We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). The officer must have more than an inchoate hunch or suspicion to justify an investigatory stop.

{¶ 21} In contrast, "[a] seizure is equivalent to an arrest when: (1) there is an intent to arrest; (2) the seizure is made under real or pretended authority; (3) it is accompanied by an actual or constructive seizure or detention; and (4) it is so understood by the person arrested." *State v. Rappley*, 2d Dist. Montgomery No. 25156, 2013-Ohio-964, ¶ 19, quoting *State v. Taylor*, 106 Ohio App .3d 741, 749, 667 N.E.2d 60 (2d Dist.1995). An arrest requires probable cause, which is significantly more than what is needed to detain a person

for the purpose of investigating a possible criminal offense.  *See id.*; *State v. Sheppeard*, 2d Dist. Clark No. 2012 CA 27, 2013-Ohio-812, ¶ 41.

{¶ 22}  Bauer responded to a dispatch for an aggravated burglary concerning the area of 324 Richmond Avenue and 807 Harvard Boulevard.  The dispatch indicated that there were three men with guns at the Richmond address; although Bauer did not explain how the Harvard address was involved, he testified that the event concerned 807 Harvard, as well.  The area was a high-crime area, it was nighttime (approximately 11:00 p.m.), and the police had previously received several weapons-related calls to that area; residents of 807 Harvard were suspected of being involved in a prior shooting.

{¶ 23}   With this background, Officer Bauer observed Williamson running from 807 Harvard shortly after the police responded to the dispatch.   Bauer saw Williamson go to the Pontiac, appear to retrieve something from his waist area, and then reach into the rear seat of the vehicle.   The officer had no information whether Williamson was legitimately at the house, and Williamson's actions suggested to Officer Bauer that Williamson was hiding a weapon.   Viewing the totality of the circumstances, Officer Bauer had a reasonable suspicion that Williamson was engaged in criminal activity so as to justify Williamson's detention.

{¶ 24}  Based on Officer Bauer's description of Williamson's seizure, it is arguable that Williamson was immediately arrested when Bauer stopped him at gunpoint, placed him in handcuffs, and put in another officer's cruiser; Williamson was not questioned, he was given *Miranda* warnings, and there was no testimony that Williamson was told that he was not under arrest, despite the officers' actions.   Even if Williamson had been under arrest, the

officers nevertheless had sufficient information to create a reasonable suspicion that Williamson had committed the offense of carrying a concealed weapon, and the officers were therefore entitled to detain him to investigate that possibility. See *State v. Rucker*, 2d Dist. Montgomery No. 24340, 2012-Ohio-4860, ¶ 69. Williamson did not make any statements after he was detained, but prior to the gun's being found.

{¶ 25} "[P]olice may search the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, if an officer possesses a reasonable belief that an individual is dangerous and may gain immediate control of weapons located in the vehicle upon returning to it." *State v. Walker*, 2d Dist. Montgomery No. 24542, 2012-Ohio-847, ¶ 28. To justify the search of a passenger compartment, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. 1868, 20 L.Ed.2d 889. However, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27; *State v. Smith*, 56 Ohio St.2d 405, 407, 384 N.E.2d 280 (1978).

{¶ 26} In this case, Officer Bauer believed that Williamson had hidden a weapon in the Bonneville. By the time Officer Reynolds searched the vehicle, the scene in front of 807 Harvard Boulevard was "chaotic" and there were several people there. Reynolds testified that the officers were trying to "corral" people and figure out what had happened. The officers reasonably believed that, for their safety, it was necessary to search the Bonneville to ascertain whether there was a weapon that could be accessed by Williamson, if

he were released, or by others in the area.  *See State v. Gardner*, 2d Dist. Montgomery No. 25312, 2013-Ohio-2015; *State v. Walker*, 2d Dist. Montgomery No. 24542, 2012-Ohio-847.

{¶ 27}  Once the gun was located, the officers had probable cause to believe that Williamson had carried a concealed weapon and to place him under arrest for that offense. Williamson was thus subject to a lawful arrest at the time he made statements at the scene, at the jail, and at the police station.  Williamson's statements were not the fruit of an unlawful arrest.

{¶ 28}  Williamson's first assignment of error is overruled.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 29}  Williamson's second assignment of error states:

THE STATE FAILED TO PRODUCE SUFFICIENT EVIDENCE TO SATISFY THE CHARGES OF THE INDICTMENT AND APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 30}  In his second assignment of error, Williamson claims that the State failed to present sufficient evidence to support his convictions and that his convictions were against the manifest weight of the evidence.

{¶ 31}  "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law."  *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).  When reviewing whether the State has presented sufficient evidence to support

a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id*.

{¶ 32} In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12. *See Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 ("'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 33} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id*. The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence.

*Wilson* at ¶ 14.   A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances.   *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

**{¶ 34}** The State's evidence at trial revealed the following facts:

**{¶ 35}** Syvella Taste-Carlisle resided at 324 Richmond Avenue with her daughter and grandchildren.   On March 17, 2012, several other individuals were visiting Taste-Carlisle's home, including Keyannia Flowers (Taste-Carlisle's niece), Lonnie Black (Taste-Carlisle's godson), and Roselynn Grant.

**{¶ 36}** At approximately 11:00 p.m., Taste-Carlisle was in her bedroom watching a movie with her guests and a few of her grandchildren when two of her teenage grandsons got into a fight in the bedroom next to hers.   Taste-Carlisle and Black separated the boys; Black took one of the boys, Shequan, downstairs to calm him down.   Taste-Carlisle initially talked to her other grandson upstairs, but he (the grandson) left the house and Taste-Carlisle went back to her movie.

**{¶ 37}** Soon after, Taste-Carlisle and Flowers heard one of Taste-Carlisle's granddaughters scream, "No.  Stop.  Stop."  Flowers, Taste-Carlisle, and others in the home came downstairs and saw Black backing into the front door of the house, fighting a group of people, including Shequan, Antwuan Rogan (Williamson's half-brother), and Tyrese Williamson (Williamson's brother).   Taste-Carlisle saw them kicking, stomping, and punching Black in the head, and she tried to protect Black with her body.   Taste-Carlisle yelled for everyone to get out and for someone to call the police.   Flowers testified that at least fifteen people came into the house during the melee.   Flowers, Grant, and others tried

to get the people out of the house.

{¶ 38} Within a few minutes, the group of people left the residence, and Taste-Carlisle, Grant, and Flowers locked the doors to the house. Taste-Carlisle went into the basement and around the house to make sure that no unwanted individuals remained. Flowers looked out the window on the front door and saw that the group had crossed the street and were standing around.

{¶ 39} Soon afterward, Flowers saw a green car pull up to a yard across the street and Williamson get out, along with a few other people. One of the women yelled, "Here comes Julius," and Flowers saw Williamson run over to 324 Richmond and kick the front door; Williamson's kick damaged the latch on the door, and Flowers slammed the door shut. Williamson "put a gun to [Flower's] face" and said, "Open the door, bitch." Taste-Carlisle testified that Williamson banged on the door and demanded to be let in. The women held the door shut, and Williamson did not enter the house. Taste-Carlisle testified that Black was in the residence but, due to the beating he had suffered, Black was not in any condition to help them.

{¶ 40} Both Flowers and Taste-Carlisle testified that Williamson had a gun. Taste-Carlisle stated that the gun was "big and black." Flowers described the weapon as a "midsize, black gun, automatic." Taste-Carlisle testified that she was not surprised to see Williamson with a gun; she stated that he was known to carry a gun that he called "his forty."

{¶ 41} Dayton police officers were dispatched on a report that individuals with guns tried to kick in a door at 324 Richmond, that the subjects fled the scene, and that the subjects

resided at 807 Harvard. Officers Bauer and Reynolds, among others, quickly responded to the scene. Bauer testified that he was watching the front of 807 Harvard from 801 Harvard, a vacant property, and he saw a man (later identified as Williamson) run from 807 Harvard to a green Pontiac Bonneville parked in front of the house, appear to pull something from his waistband area, and reach into the rear passenger area. Officer Bauer detained Williamson and began to search the vehicle for a weapon, but he stopped when people began coming out of 807 Harvard.

{¶ 42} Officer Reynolds arrived while "a lot of people [were] coming out of the front of 807 Harvard." At Officer Bauer's request, Reynolds searched the passenger compartment of the vehicle and located a loaded 40-caliber Glock model 22 semiautomatic pistol positioned in the trunk behind a fold-down rear seat armrest. On cross-examination, Reynolds stated that the gun was situated in a way that a right-handed person would lay it. Taste-Carlisle could not identify the weapon as Williamson's, but Flowers testified that the gun looked like the gun she had seen Williamson holding; Flowers stated that the gun found by Officer Reynolds was the same style, size, and color as the one Williamson had. The parties stipulated that the 40-caliber Glock was operable.

{¶ 43} Detective Engel testified that he interviewed Williamson on March 19, 2012. Williamson told Engel that he had gotten a call from his brother, Antwaun, who had said that Black had punched him (Antwaun) in the jaw. Williamson told Engel that he went to 807 Harvard, met up with his brothers behind the house, and later went up on the porch; Williamson denied going to 324 Richmond and having a gun. Williamson told the detective that he intended to beat up Black, but he did not. Williamson stated that the

people at 324 Richmond were like family to him and that Taste-Carlisle's daughter was his girlfriend and took care of three of Williamson's children.

{¶ 44} Williamson testified on his own behalf and he presented Antwaun Rogan as a defense witness. Rogan stated that Black sucker-punched him, starting a fight between Black, Rogan, and Tyrese Williamson at 324 Richmond. After everyone left the Richmond house, Rogan and Tyrese Williamson went to the alley behind 807 Harvard and Rogan called Williamson, his older half-brother. After Williamson arrived, they talked in the alley and then went to the front porch of 807 Harvard. Rogan testified that Williamson was on the porch until the police arrived. Rogan did not see Williamson with a weapon and did not hear Williamson threaten anyone; he stated that Williamson never went to the Bonneville. Rogan testified that Williamson was left-handed.

{¶ 45} Testifying on his own behalf, Williamson stated that he arrived in his brother's girlfriend's Bonneville and went to the alley behind 807 Harvard, where his two brothers were. After talking for a few minutes, the three went onto the front porch. Williamson also denied that he returned to the Bonneville, that he went to 324 Richmond, and that he had a gun. Williamson stated that he intended to beat up Black, but he did not go to 324 Richmond because no one was outside. Williamson also stated that he was left-handed and only used his right hand for fighting.

{¶ 46} Upon review of the State's evidence, we conclude that the State presented sufficient evidence to support Williamson's convictions and that his convictions were not against the manifest weight of the evidence.

{¶ 47} Williamson was found guilty of attempted aggravated burglary, pursuant to

R.C. 2923.02(A) and R.C. 2911.11(A)(1). R.C. 29211.11(A)(1), a portion of the aggravated burglary statute, provides: "No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit * * * any criminal offense, if any of the following apply: [t]he offender inflicts, or attempts or threatens to inflict physical harm on another."

{¶ 48} Taste-Carlisle knew Williamson for many years, and Flowers knew Williamson for a few months before March 17, 2012. Both women testified that, shortly after the fight involving Black and Williamson's brothers and others, Williamson came to the front door of 324 Richmond Avenue, kicked at the door with enough force to damage it, and yelled at the women to let him in. Both women stated that Williamson was holding a gun, and that they held the door closed. Williamson had told Detective Engel in a subsequent interview that he had intended to beat up Black, who was inside 324 Richmond. This testimony, if believed, was sufficient to prove that Williamson attempted to commit aggravated burglary at 324 Richmond Avenue.

{¶ 49} Williamson presented testimony that he went directly to 807 Harvard Boulevard and met with his brothers. He and Rogan both stated that they talked in the rear of 807 Harvard and then went around to the front porch; both testified that Williamson did not go to 324 Richmond. The credibility of the witnesses and the weight to be given to their testimony were matters for the jury, as the trier of fact, to determine. Considering all of the evidence presented at trial, the jury did not lose its way simply because it chose to believe the version of events presented by the State.

{¶ 50} Williamson was also convicted of tampering with evidence, in violation of

R.C. 2921.12(A)(1), which states: "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following: (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." Williamson emphasizes that Taste-Carlisle could not identify the gun recovered from the Bonneville as his, that Officer Bauer did not see him with a gun, and there was no evidence directly linking him with the gun in the Bonneville.

{¶ 51}  The State's evidence established that Williamson attempted to gain entry into 324 Richmond Avenue with a big, black gun, which Flowers described as a midsize, automatic black gun.  Taste-Carlisle testified Williamson was known to carry a gun that he called "his forty."  Shortly after the police responded to 324 Richmond, which was visible from the rear of 807 Harvard, Williamson ran out of the front door of 807 Harvard, got into the front passenger seat of a Pontiac Bonneville parked in front of that house, reached into his waistband, twisted in the front seat, and reached into the rear of the vehicle, with his hip on the console.  Williamson was detained by the police upon leaving the vehicle.  When Officer Reynolds searched the vehicle, he located a loaded 40-caliber Glock model 22 semiautomatic pistol positioned in the trunk behind a fold-down rear seat armrest.  Viewing the evidence in the light most favorable to the State, there was sufficient evidence to prove that Williamson was attempting to hide from the police the weapon he had used in the attempted aggravated burglary.

{¶ 52}  At trial, Taste-Carlisle testified that she could not identify the weapon found by Officer Reynolds as the one that Williamson had on March 17.  Williamson's counsel

also elicited testimony from Officer Reynolds that the Glock was positioned in the car in a way that a right-handed person would place it. Williamson and Rogan both testified that Williamson was left-handed.

{¶ 53} In contrast, Officer Bauer described Williamson as reaching into the back seat of the Bonneville with his left hip on the console and his upper body completely extended. Even accepting that Williamson is left-handed, the jury could have reasonably concluded that Williamson used his right hand to place the gun behind the rear seat armrest. In addition, Flowers testified that the gun recovered by the officer looked like the gun Williamson had, and that the gun was the same style, size, and color as Williamson's weapon. Flowers could not "say for sure" that the gun was Williamson's, but she testified that "it looked like – pretty much like that one." We cannot conclude that Williamson's conviction for tampering with evidence was against the manifest weight of the evidence.

{¶ 54} Williamson asserts that his conviction for having weapons while under disability cannot be predicated on the gun found inside the Bonneville. For the reasons stated above, the State presented sufficient evidence that Williamson had a weapon on March 17, 2012. Moreover, the State provided evidence that Williamson could not lawfully have a gun due to an April 13, 2007 conviction for possession of crack cocaine. Williamson's conviction for having a weapon while under disability was based on sufficient evidence and was not against the manifest weight of the evidence.

{¶ 55} Williamson's second assignment of error is overruled.

### III. Consecutive Sentences

{¶ 56} Williamson's third assignment of error states:

THE TRIAL COURT [FAILED] TO MAKE THE REQUISITE STATUTORY FINDINGS BEFORE IT SENTENCED APPELLANT TO CONSECUTIVE SENTENCES

**{¶ 57}** At sentencing, the trial court imposed six years for attempted aggravated burglary, 18 months for having a weapon while under disability, 18 months for tampering with evidence, and three years for the firearm specification associated with the attempted aggravated burglary. The two 18-month sentences were to be served concurrently with each other, but consecutively to the six-year sentence. In addition, the three-year sentence for the firearm specification was to be served consecutively to and prior to the aggregate 7½-year definite sentence, for a total sentence of 10½ years in prison.

**{¶ 58}** R.C. 2929.14(C)(4) permits a trial court to impose consecutive sentences if it finds that (1) consecutive sentencing is necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) any of the following applies:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison

term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶ 59}** In most cases, "[t]he trial court is not required to give reasons explaining these findings, nor is the court required to recite any 'magic' or 'talismanic' words when imposing consecutive sentences. * * * Nevertheless, the record must reflect that the court made the findings required by the statute." *State v. Temple*, 2d Dist. Clark No. 2012-CA-65, 2013-Ohio-3843, ¶ 21, quoting *State v. Hubbard*, 10th Dist. Franklin No. 11AP-945, 2013-Ohio-2735, ¶ 86.

**{¶ 60}** Williamson claims that the trial court failed to make the statutory findings before imposing consecutive sentences. The State concedes that the trial court did not make the required findings under R.C. 2929.14(C)(4) and that "consecutive sentences cannot stand." Upon review of the sentencing hearing transcript, we agree with both parties that the trial court failed to make the required findings and that the matter must be remanded for resentencing.

**{¶ 61}** Williamson's third assignment of error is sustained.

### IV. Conclusion

**{¶ 62}** Williamson's sentence will be reversed, and the matter will be remanded for the trial court to consider whether consecutive sentences are appropriate under R.C. 2929.14(C)(4) and, if so, to enter the proper findings on the record. In all other respects, the

trial court's judgment will be affirmed.

. . . . . . . . . .

DONOVAN, J., concurs.

FAIN, J., concurring:

{¶ 63}    I concur in both the opinion and judgment of this court.  I write separately merely to note that in my view, the mere fact that the perpetrator of an offense involving a firearm, after the offense has been committed, divests the firearm from his person, putting it in some other place where one might expect the firearm to be kept (in this case, in the trunk of his vehicle), without more, is not sufficient to make out the offense of Tampering with Evidence.  Otherwise, the law would be encouraging the perpetrator to continue to keep the firearm on his person, lest the perpetrator be convicted of Tampering, in addition to being convicted of the offense he has just committed, which would not be good public policy.  In my view, it would be preferable that the perpetrator disarm himself after committing a violent offense.

{¶ 64}    Here, however, there is more.  By his own admission, Williamson was aware of police cruisers in the vicinity when he put the firearm in the trunk of his vehicle, and Officer Bauer's description of Williamson's actions in entering his vehicle after the Attempted Aggravated Burglary supports a reasonable inference that Williamson was attempting to conceal the weapon from the notice of the police on the scene.  In this case, therefore, I conclude that there is sufficient evidence to support the Tampering with Evidence conviction, and that conviction is not against the manifest weight of the evidence.

. . . . . . . . . .

Copies mailed to:

April F. Campbell
Michael T. Columbus
Hon. Frances E. McGee