[Cite as *State v. Shakhmanov*, 2019-Ohio-4598.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28009 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-1987/5 |
| | : | |
| SEVIL SHAKHMANOV | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 8th day of November, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

ANTHONY R. CICERO, Atty. Reg. No. 0065408, 500 East Fifth Street, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, J.

{¶ 1} Defendant-appellant Sevil Shakhmanov appeals from his conviction for felonious assault.[1]   Sevil challenges the trial court's decisions denying his motion to suppress and denying his motion for a mistrial. Sevil also claims he was denied the effective assistance of counsel at trial.   Finally, he contends he is entitled to a new trial and, at this trial, retroactive application of the burden shifting changes made by the Ohio General Assembly to Ohio's self-defense statute, R.C. 2901.05.   For the reasons that follow, we affirm.

## I.      Facts and Procedural History

{¶ 2} Aydin Akhmdov worked as a driver for Ameripro Logistics, L.L.C. (hereinafter Ameripro), a Dayton trucking company owned by Sevil's brother, Mustafa Shakhmanov. In 2015, Aydin broke his leg and was unable to work.   Aydin claimed that when he stopped working, the company owed him $1,800.   Aydin also claimed that, over the course of several months, he attempted to contact Mustafa regarding the money owed. On June 7, 2016, Aydin called Sevil, who he identified as a manager and dispatcher at Ameripro.   Sevil told Aydin to come to the Ameripro offices.

{¶ 3} In *State v. Koch*, 2d Dist. Montgomery No. 28041, 2019-Ohio-4182, the appeal of one of Sevil's co-defendants, this court set forth the following description of the events that occurred when Aydin arrived at the Ameripro offices:[2]

---

[1] Sevil's brothers Mustafa Shakhmanov and Sobir Shakhmanov were also involved in the altercations underlying this appeal.   For ease of reference, we will refer to the all three by their first names.

[2] *Koch* involved the direct appeal of Baris Koch, another individual involved in the

Surveillance cameras located outside the Ameripro office recorded the encounter between Aydin and members of the Shakhmanov and Koch families. In the video, Aydin can be seen arriving at Ameripro and parking his car at a tire business across Valley Street from Ameripro. Aydin testified that as he sat in his parked car, he observed Sevil remove a tire iron from his car and hide it in his pants. The video shows that Aydin got out of his vehicle and stood in the tire business parking lot, facing Ameripro's lot. Sevil and Mustafa walked to the edge of the Ameripro lot, and the two men can be seen attempting to call Aydin across the street. When Aydin refused to cross the street, Sevil, Mustafa, and their brother, S[o]bir, who had joined them, walked across the street to where Aydin was standing.

While the three men talked to Aydin, Izmir and Murad Koch drove up in a white BMW sedan and parked behind where all of the men were talking, perpendicular to Aydin's Honda. At that point, the men surrounded Aydin. Aydin moved next to the driver's side door of his Honda, and the group moved with him. After the apparent verbal disagreement continued there for approximately 40 seconds, Aydin attempted to walk away from the men. Murad ran toward Aydin and repeatedly hit him with a collapsible metal baton as Aydin attempted to back away. After Aydin ran between some vehicles parked nearby, all five men followed him and began beating him.

underlying altercations. Because Baris shares the same last name as his two brothers, Izmir and Murad, we will also refer to them by their first names.

Aydin testified that during the assault, Sevil struck him in the head with a tire iron. The physical assault lasted for approximately 20 seconds, and it stopped when an unconnected person intervened. The men continued to engage verbally.

At this juncture, Baris [Koch] and Kamil Abbasov, another cousin, drove into the tire business's parking lot in a black SUV. While still verbally arguing with the Shakhmanovs, Izmir and Murad, Aydin returned to his vehicle and left the scene in his Honda. As Aydin drove away, the video depicts Mustafa picking up a rock and throwing it at Aydin's vehicle. Thereafter, Izmir and Baris relocated their vehicles to Ameripro's parking lot.

After Aydin left, Mustafa and Sevil could be seen in the Ameripro lobby, talking with Kamil. Sobir repeatedly looked out the lobby door. * * * Approximately nine minutes after the end of the first altercation, Murad and Izmir left Ameripro in the white BMW.

Approximately 12 minutes after the first encounter, Aydin returned to Ameripro, again parking his vehicle across the street in the tire business's parking lot. Aydin got out of his vehicle and leaned against the hood, facing Ameripro. He was armed with brass knuckles and a pocket knife in his pocket. Aydin testified that he shouted at Sevil from across the street regarding the back pay he was owed. The video depicts Sevil responding by making a profane gesture directed at Aydin.

A few minutes after Aydin returned, the Shakhmanov brothers can

be seen in the Ameripro lobby placing metal poles and rebar just inside the door of the business.   * * *

Approximately six minutes after Aydin returned, Murad and Izmir also returned in their white BMW and parked in the Ameripro side parking lot. Murad, armed with a metal baton, began yelling at Aydin from across the street and started walking toward Aydin in the Ameripro parking lot.   Izmir followed a short distance behind, followed by Sevil.   Murad walked across the street to where Aydin was standing.   Aydin testified that they were yelling at him as they approached him, stating that they were going to "tear him to pieces."   When Murad approached him with the metal baton (still lowered), Aydin pulled out a pocketknife and stabbed Murad in the arm. Thereafter, Aydin attempted to run away but was chased by Murad, Izmir, and Sevil.   Mustafa, armed with rebar, ran up to the group and joined the fray.

While the group chased Aydin, Baris came out of the Ameripro lobby, and he, Kamil, and Sobir watched from the front Ameripro parking lot. Aydin tripped and fell down in the tire business's parking lot, at which point Mustafa began striking him with a metal pole and Izmir can be seen kicking him in the head and upper body.   Murad also ran up and struck Aydin with a metal pole.   Aydin testified that Sevil was about to hit him with a metal pole.   Aydin, however, was able to retrieve the set of brass knuckles from his pocket and strike Sevil, knocking him to the ground. Aydin then ran across the street toward the Ameripro office in an effort to escape from his

attackers.

Upon reaching the parking lot in front of Ameripro, however, Aydin was struck in the head from behind with a metal pole by Murad. When Aydin fell to the ground, Murad, Mustafa, and Kamil began hitting him with metal poles. Izmir, who did not have a weapon, could be seen kicking Aydin in the head. Thereafter, Sobir pulled his brothers and cousins away from Aydin. Eventually, Aydin was able to stand up and walk back across the street toward where his car was parked. * * *

At this point, another individual at Ameripro, named Aziz, called 911 after seeing the injury to Murad's arm; he reported that someone had been stabbed.

Izmir followed Aydin across the street and continued arguing with him. As Aydin neared his car, he turned around and began walking back toward the tire business and Izmir. The video shows Izmir and Aydin fighting. At this juncture, Baris ran across the street and jump-kicked Aydin in the head, knocking him either into a wooden fence or to the ground by a wooden fence Mustafa, Murad, and Kamil also ran across the street to continue attacking Aydin.

The video shows that Aydin walked away and continued arguing with Izmir and Mustafa. As Sobir, Murad, and Baris joined Mustafa, Baris took off his shirt and attempted to wrap Murad's arm. Several men chased Aydin behind the wooden fence where the assault apparently continued. * * *

The video did not capture what occurred behind the fence, but Aydin testified that he saw a baseball bat on the ground, picked it up, hit Mustafa a couple of times with it, and then the bat was taken away [from] him. Aydin testified "all seven people," meaning the Shakhmanovs, the Kochs, and Abbasaov, assaulted him behind the fence. Aydin testified that Baris "was beating me, too." (Tr. at 373.) The group was behind the fence for approximately 52 seconds. Murad came out from behind the fence carrying the baseball bat.

Twenty-six seconds after the group left the fenced area, Aydin walked out from behind the fence without his shirt and wearing only one shoe. Aydin walked to his vehicle and got inside, but when he tried to leave, Izmir walked over to the vehicle, reached into the front passenger side window and took the key out of the ignition. Thereafter, Aydin simply remained seated in his vehicle and waited for the police, who arrived moments later.

*Id.* at ¶ 6-19.

{¶ 4} On July 5, 2016, Sevil, Mustafa, Sobir, Izmir, Murad and Baris, were each indicted on one count of felonious assault (deadly weapon), and one count of felonious assault (serious physical harm). Kamil was indicted on July 20, 2016. The defendants filed a motion to suppress the video surveillance recording that the police had taken from Mustafa's office at Ameripro. They later filed an amended motion to suppress arguing that Mustafa did not give valid consent for the seizure. Following a hearing on the motion to suppress, the trial court issued a decision in which it concluded the following:

\* \* \* As to [Mustafa's] office, [Sevil] presented no evidence as to ownership or right of access generally nor specifically as to the DVR and its recordings. [Sevil] did not sustain [his] burden of proof to show a reasonable expectation of privacy in the business areas entered by the police. [Sevil] presented no evidence pertaining to [his] personal ownership, possession, control, use, ability to regulate access, subjective privacy concerns, nor objective privacy considerations as to the site or the evidence at issue. \* \* \* There is simply no evidence that any of the co-defendants, other than Mustafa Shakhmanov, would possess a reasonable expectation of privacy \* \* \* to the areas entered by the police. \* \* \*

{¶ 5} The record shows that the trial court intended to hold separate trials for each of the co-defendants. However, In November 2017, Izmir filed a motion requesting that he and his brother Murad be tried together. Subsequently, Sevil and Kamil were joined, and a trial of the four was commenced in March 2018. The jury found Sevil guilty of both counts of felonious assault. The trial court sentenced Sevil to a term of community control sanctions.

{¶ 6} Sevil appeals.

## II. Expectation of Privacy Analysis

{¶ 7} Sevil's first assignment of error states:

THE TRIAL COURT ERRED BY HOLDING THAT APPELLANT COULD NOT MOVE TO SUPPRESS EVIDENCE IN THIS MATTER BECAUSE HE

DID NOT HAVE A PERSONAL EXPECTATION OF PRIVACY AT THE BUSINESS FROM WHICH THE SURVEILLANCE VIDEO WAS OBTAINED, IN VIOLATION OF HIS RIGHTS UNDER THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTION 14 OF THE CONSTITUTION OF OHIO.

{¶ 8} Sevil contends that the trial court erred by denying his motion to suppress the surveillance recording that was taken from Mustafa's office located in the Ameripro building. In support, Sevil claims that he had a reasonable expectation of privacy in the business property, including Mustafa's office.

{¶ 9} "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." (Citation omitted). *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." (Citation omitted.) *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citation omitted.) *Id.* With this standard of review in mind, we turn to the question of whether Sevil was entitled to suppression of the surveillance video.

{¶ 10} "The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures." *State v. Roberts*, 2d Dist. Montgomery No. 23219, 2010-Ohio-300, ¶ 14, citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). An analysis of this Fourth Amendment protection

"focuses, primarily, on whether a person has a 'constitutionally protected reasonable expectation of privacy.' " *State v. Peterson*, 173 Ohio App.3d 575, 2007-Ohio-5667, 879 N.E.2d 806 (2d Dist.), quoting *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).

{¶ 11} "[T]he person challenging the legality of a search bears the burden of proving that he or she has a legitimate expectation of privacy in the place searched that society is prepared to recognize as reasonable." *State v. Dennis*, 182 Ohio App.3d 674, 2009-Ohio-2173, 914 N.E.2d 1071, ¶ 21 (2d Dist.), citing *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) and *State v. Williams*, 73 Ohio St.3d 153, 166, 652 N.E.2d 721 (1995). "The individual must have a subjective expectation of privacy in the place searched, and that expectation must be objectively reasonable and justifiable." *Id.*, citing *Rakas* at 143; *State v. Buzzard*, 112 Ohio St.3d 451, 2007-Ohio-373, 860 N.E.2d 1006, ¶ 14. The following factors have been considered in determining whether an individual's expectation of privacy is reasonable: "(1) ownership, (2) possession and/or control, (3) historical use of the property, (4) ability to regulate access, (5) subjective anticipation of privacy, (6) objective reasonableness of that anticipation, and (7) the totality of the circumstances." (Citations omitted.) *State v. Trammell*, 2d Dist. Montgomery No. 17196, 1999 WL 22884, *6.

{¶ 12} The prohibition on unreasonable searches and seizures applies both to commercial premises and to private homes. *New York v. Burger*, 482 U.S. 691, 699, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). However, the expectation of privacy in commercial property "is different from, and indeed less than, a similar expectation in an individual's home." (Citation omitted.) *Id.* at 699. *Accord State v. Henderson*, 2d Dist.

Montgomery No. 22062, 2008-Ohio-1160, ¶ 13.

{¶ 13} In challenging the trial court's findings, Sevil argues that the trial court placed too much emphasis on the ownership and control of the business and ignored other factors indicating that he had a reasonable expectation of privacy in the business premises. Specifically, Sevil contends the transcript of the suppression hearing demonstrates that, as Mustafa's brother, he helped run the business and thus had "the ability to regulate access through the use of keys and access cards." He also claims the transcript demonstrates that he "had access to the room in which the video surveillance equipment was maintained and operated." We disagree.

{¶ 14} Mustafa was the only co-defendant to testify during the suppression hearing. The undisputed evidence demonstrates that the surveillance recording equipment was housed in Mustafa's personal office. While Mustafa's testimony did indicate that he and his brothers, Sevil and Sobir, operated the business, his trial counsel conceded that Mustafa was the owner and registered agent for service of process for the company. Further, while the evidence indicated that Mustafa had supplied all of the co-defendants with keycards that gave them access to the business premises, Mustafa's testimony indicated that the access was not unfettered. Specifically, Mustafa testified that his cousin and co-defendant, Baris Koch, had been provided a keycard. Counsel for Baris was the first defense attorney to cross-examine Mustafa during the suppression hearing. Counsel asked Mustafa whether Baris had access to the office. Mustafa testified that Baris did not have access to Mustafa's private office. There was no evidence that the keycard issued to Baris permitted him more or less access to the business premises than the keycards issued to the other co-defendants. Further, no

evidence was adduced to demonstrate that any of the keycards issued by Mustafa permitted access into his office, and no other evidence otherwise indicated that Sevil had unfettered access to that office.

**{¶ 15}** Based upon the record before us, we conclude that the trial court did not err in finding Sevil failed to meet his burden to establish that he had a reasonable expectation of privacy in Mustafa's personal office. Therefore, we conclude that the trial court did not err in overruling his motion to suppress the surveillance video.

**{¶ 16}** The first assignment of error is overruled.

### III.     Consent Analysis

**{¶ 17}** The second assignment of error asserted by Shakhmanov states:

THE TRIAL COURT ERRED BY HOLDING THAT CONSTITUTIONALLY VALID CONSENT WAS PROVIDED FOR THE COLLECTION OF THE SURVEILLANCE VIDEO.

**{¶ 18}** Sevil challenges the trial court's finding that Mustafa knowingly and voluntarily consented to the police seizure of the surveillance video. However, given our disposition of the first assignment of error, finding that Sevil did not have a reasonable expectation of privacy in Mustafa's personal office, we conclude that this argument is of no relevance to Sevil's case.

**{¶ 19}** The second assignment of error is overruled.

### IV.     Mistrial Analysis

**{¶ 20}** Shakhmanov's third assignment of error is as follows:

THE TRIAL COURT ERRED BY NOT DECLARING A MISTRIAL WHEN NEWS ACCOUNTS RELATING TO THE ARREST OF CO-DEFENDANT IZMIR KOCH IN A SEPARATE MATTER WERE PUBLISHED DURING THE TRIAL THEREBY VIOLATING HIS RIGHT TO DUE PROCESS OF LAW UNDER THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTION 10 OF THE CONSTITUTION OF OHIO.

{¶ 21} Sevil contends that the trial court should have granted a mistrial after media reports that his co-defendant had been arrested during trial. He further argues that the discovery that a juror had read a news article regarding the arrest mandated a mistrial.

{¶ 22} "The granting or denial of a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." (Citations omitted.) *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). The term "abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable. *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985).

{¶ 23} According to the record, following the conclusion of the second day of trial, Izmir Koch was arrested and detained in Cincinnati on unrelated federal charges. Izmir was, therefore, unable to attend trial the following day, which caused the trial court to grant a one-day continuance. Trial resumed the following day, at which time defense counsel requested a mistrial based upon a demonstration that local media had published information regarding the arrest. The trial court decided to ask the jurors as a group, rather than individually, whether they had seen or heard any media reports related to the

case. None of the jurors indicated that they had had contact with any media reports concerning the case. Thereafter, the trial court reiterated its initial instructions prohibiting jurors from contact with media reports during the course of the trial. Based upon the lack of a response by any jurors, the trial court denied the request for a mistrial.

{¶ 24} Sevil argues that the trial court questioned the jury about their exposure to media reports the day after having "postponed [the trial] for unspecified reasons." Thus, he claims that, while the jurors might not have known the details of what had transpired, they "were aware that (1) Co-Defendant Izmir Koch was not present in the courtroom on [the day the trial was postponed; (2) the trial had to be postponed on that day due to an 'unexpected delay'; (3) the next day, Co-Defendant Izmir Koch was back in the courtroom and the trial court questioned the jury about having seen media reports." He argues that these facts mandate the conclusion that the jury was aware that "something happened the day before to keep Co-Defendant Izmir Koch from being in court, and there had been media reports about it."

{¶ 25} We first note that, on the second day of trial when Izmir was in federal custody, the trial court informed the jury that the trial would be delayed for one day. The trial court did not specify the reason for the delay. The only persons present in the courtroom at that time were the judge, the judge's staff and the jury. None of the defense attorneys, prosecutors, or defendants were present in the courtroom. Thus, the jury did not have the opportunity to note that Izmir was not present. Further, even if the jury did connect the one-day delay to the court's subsequent inquiry regarding media exposure, there was no way to connect it to the conduct of any particular defendant. All the jury was aware of, according to the record, is that an issue with media reports had arisen;

something they had been admonished to avoid. Given that the jury had been consistently instructed to avoid the media during the trial, there was nothing that would lead the jury to surmise that the media reports concerned any new charges against any of the defendants. It is just as likely that the jurors believed that the trial court had delayed trial due to one of the jurors being exposed to media reports. In any event, Sevil has failed to demonstrate, and we cannot discern, any prejudice arising from this issue. Thus, we cannot say that the trial court abused its discretion in denying the requested mistrial.

{¶ 26} Sevil next contends that the trial court should have granted a mistrial when, on the morning of the final day of trial, Juror Number Seven informed the bailiff that she had read a portion of a Dayton Daily News article before realizing that it was about the arrest of Izmir Koch. It appears that the juror read the article the previous night.

{¶ 27} The court conducted an inquiry of the juror outside the presence of the other jurors. The court asked the juror, in several different ways, whether what she had read would affect her ability to be fair and impartial in this case and to decide this case solely on the evidence presented at trial. The juror indicated, multiple times, that the article would not impair her ability to serve as a juror on this case. The juror was instructed that she should not discuss the article or the court's discussion with her with the other jurors. Sevil argues that this information mandated a mistrial when it came to light.

{¶ 28} We first note that, after questioning the juror, the court asked defense counsel whether they were satisfied with the juror's responses. None of the parties requested a mistrial. Nor did they request that the juror be replaced by the alternate juror. Thus, we review this argument under a plain error standard. To establish plain

error, a defendant must point to an obvious error that affected the outcome of the proceedings below. *State v. Rohrbaugh*, 126 Ohio St.3d 421, 2010-Ohio-3286, 934 N.E.2d 920, ¶ 6. Reversal is warranted only if the outcome "clearly would have been different absent the error." *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001). "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Rohrbaugh* at ¶ 6, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 29} The juror read an article concerning Izmir, and there was no indication that it involved any of the other defendants. The record demonstrates that the trial court engaged the juror in a thorough colloquy about the effect of that article, which we conclude was sufficient to permit the court to reasonably conclude that the juror had not been prejudiced thereby and that she would be able to act fairly and impartially in rendering a verdict based solely upon the evidence presented in the case before her. Finally, the fact that none of the defense attorneys questioned the juror's ability to be impartial following the court's questioning and that none sought a mistrial or the replacement of the juror indicates that the trial court did not err in failing to sua sponte grant a mistrial.

{¶ 30} Based upon this record, we find no error, let alone plain error, that would cause us to question the trial court's decision to leave the juror on the panel. Accordingly, the third assignment of error is overruled.

## V.    Ineffective Assistance Analysis

{¶ 31} The fourth assignment of error states:

APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTION 10 OF THE CONSTITUTION OF OHIO WHEN HIS TRIAL COUNSEL ACQUIESED IN THE ELIMINATION OF A JURY INSTRUCTION ON THE LESSER-INCLUDED OFFENSE OF ASSAULT AND DID NOT SEEK TO SEVER APPELLANT'S CASE.

**{¶ 32}** Sevil contends that he was denied the effective assistance of counsel because trial counsel stipulated that Aydin suffered serious physical harm, thereby precluding an instruction on the lesser included offense of misdemeanor assault. He further contends that trial counsel should have opted to sever his case from that of his co-defendants.

**{¶ 33}** To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that counsel's performance was "seriously flawed and deficient," and there is a reasonable probability that the result of the defendant's trial or legal proceeding would have been different had defense counsel provided proper representation. *State v. LeGrant*, 2d Dist. Miami No. 2013-CA-44, 2014-Ohio-5803, ¶ 26, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶ 34}** To establish the first prong of ineffective assistance, it must be demonstrated that counsel's performance fell "so below the reasonably objective standards of the legal community as to constitute a substantial violation of counsel's essential duties to his client." (Citation omitted.) *State v. Smith*, 72 Ohio App.3d 342, 344, 594 N.E.2d 688 (2d Dist.1991). "Trial counsel is entitled to a strong presumption

that his or her conduct falls within the wide range of reasonable assistance, and a defendant, in order to overcome the presumption that counsel is competent, must show that counsel's decisions were 'not trial strategies prompted by reasonable professional judgment.' " (Citation omitted.) *State v. Few*, 2d Dist. Montgomery No. 25161, 2012-Ohio-5407, ¶ 10. "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." *Id.* at ¶ 11, quoting *State v. Nabors*, 2d Dist. Montgomery No. 24582, 2012-Ohio-4757, ¶ 17, citing *State v. Mitchell*, 2d Dist. Montgomery No. 21957, 2008-Ohio-493, ¶ 31. "Even if unsuccessful, strategic decisions will not constitute ineffective assistance of counsel." *Id.*, citing *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995). "The decision regarding which defense to pursue at trial is a matter of trial strategy, and trial strategy decisions are not, generally, a basis of a finding of ineffective assistance of counsel." (Citations omitted.) *State v. Moss*, 2d Dist. Montgomery No. 22496, 2008-Ohio-6969, ¶ 35.

{¶ 35} We begin with Sevil's claim that defense counsel was ineffective for failing to request a separate trial. R.C. 2945.13 states, "[w]hen two or more persons are jointly indicted for a felony, except a capital offense, they shall be tried jointly unless the court, for good cause shown on application therefor by the prosecuting attorney or one or more of said defendants, orders one or more of said defendants to be tried separately." The "[j]oinder of defendants and the avoidance of multiple trials is favored in the law" because it "conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of

incongruous results in successive trials before different juries." *State v. Thomas*, 61 Ohio St.2d 223, 225, 400 N.E.2d 401, 404 (1980). The question of whether an accused should be tried separately is a matter left to the discretion of the trial court. *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981). The burden to show that joinder was improper by demonstrating that joinder resulted in prejudice is upon the defendant. *Id.*

{¶ 36} We first note that all of the charges against the co-defendants involved the same altercation. Thus, all of the evidence and exhibits, including the surveillance video and Aydin's testimony, introduced in this trial would have been introduced in separate trials. Further, on the day Izmir was in custody in Cincinnati, the trial court suggested that Izmir's case be continued so that the trial of the remaining co-defendants could proceed. Each of the defense attorneys objected and informed the court that the case had been "strategically organized," and that trying the co-defendants together was necessary for the success of each defendant's case. This fact alone is sufficient to permit us to infer that the decision not to seek severance was a matter of trial strategy that we are reluctant to question. Finally, other than broad statements that counsel did not provide the "most vigorous defense," Sevil has failed to demonstrate prejudice. His claim that the joinder of the cases caused him to cede his right to an instruction on lesser-included offenses is without merit, as we cannot ascertain whether counsel's decision regarding this issue would have been any different if Sevil had been tried separately. Based upon this record, we cannot say that trial counsel was ineffective with regard to the failure to seek a separate trial.

{¶ 37} Sevil next contends that counsel was ineffective because he agreed to

stipulate that Aydin suffered serious physical harm and thereby prevented Sevil from seeking a jury instruction on the lesser included offense of misdemeanor assault. Serious physical harm, as defined by R.C. 2901.01(A)(5), includes the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶ 38} During trial, Aydin testified that he suffered a laceration to his head that occurred when Sevil struck him with a tire iron. He also testified that his body was covered in bruises after the attack.

{¶ 39} After Aydin's testimony, counsel and the trial court discussed the necessity of presenting the testimony of three doctors who would testify on behalf of the State as to the injuries. One of the doctors was expected to testify that Aydin suffered a concussion and that he continued to suffer from post-concussive syndrome, which causes nausea, headaches and dizziness. There is nothing in the record to indicate that this evidence would have or could have been rebutted by any defense witness. Defense counsel, who had copies of the doctors' reports, decided to stipulate that Aydin suffered serious physical harm, possibly in order to avoid the testimony of three physicians who would

discuss the injuries and their aftermath in detail. Given the unrebutted evidence the State intended to introduce regarding Aydin's injuries, we cannot say the decision to stipulate was an unreasonable strategy or that it rose to the level of a substantial violation of counsel's essential duties to his client.

{¶ 40} The fourth assignment of error is overruled.

### VI.    New Trial Analysis

{¶ 41} Sevil's fifth assignment of error states:

THE FAILURE TO APPLY IN THE INSTANT CASE THE RULE SET FORTH BY THE UNITED STATES SUPREME COURT IN *GRIFFITH V. KENTUCKY*, 479 U.S. 314 (1987) AND ITS PROGENY THAT NEW RULES OF CRIMINAL PROCEDURE MUST BE APPLIED RETROACTIVELY FOR ALL CASES UNDER DIRECT REVIEW AS IT APPLIES TO OHIO'S SHIFTING OF THE BURDEN OF PROOF FROM THE DEFENDANT TO THE STATE FOR THE AFFIRMATIVE DEFENSE OF SELF-DEFENSE WOULD VIOLATE THE DUE PROCESS CLAUSES OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

{¶ 42} Sevil notes that the General Assembly amended the statute governing the burden of proof regarding the affirmative defense of self-defense after his trial had concluded but prior to our review. He contends that the amendment should be applied and made retroactive and that his conviction should be reversed and the matter remanded for a new trial.

{¶ 43} This exact issue, along with the same arguments and cited case law, was

raised in co-defendant Izmir Koch's direct appeal to this court. In that case, we stated that the defendant was "not entitled to retroactive application of the burden shifting changes by the legislature to Ohio's self-defense statute, R.C. 2901.05, as a result of H.B. 228." *State v. Koch*, 2d Dist. Montgomery No. 28000, 2019-Ohio-4099, ¶ 103. For the reasons set forth in *Koch*, we find Sevil's argument to be without merit.

**{¶ 44}** The fifth assignment of error is overruled.

## VII.    Conclusion

**{¶ 45}** All of Sevil's assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and FROELICH, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Anthony R. Cicero
Hon. Mary Lynn Wiseman